610 A.2d 782

**Frederick William REYNOLDS, Jr.**

**v.**

**STATE of Maryland.**

No. 121, Sept. Term, 1991.

Court of Appeals of Maryland.

Aug. 24, 1992.

Judith S. Stainbrook (Stephen P. Bourexis, both on brief), Westminster, for petitioner/cross respondent.

Diane Krejsa, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent/cross petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

There are several links in the long chain that brings this case to us. The first—and certainly not the least—is when members of the family of Frederick William Reynolds, Jr.,

confronted him, late in the spring of 1989, with dark secrets two of his adult daughters had just shared with them. For years, according to the women, Reynolds had sexually abused them at the family farm in Carroll County when they were children; one he had repeatedly raped throughout her youth and into her adolescence. Now in his 50s with the girls grown, Reynolds was no longer engaged in criminally incestuous behavior. But also now there were granddaughters, and Crystal, the eldest daughter and the one who had suffered the most, feared for them. That fear led her to tell other family members what had happened to her; she learned she was not the only daughter who had been sexually abused. The family then confronted Reynolds and urged him to get help.

Reynolds went to a pastor, who counseled him and other family members for a period of time. The cleric's schedule did not allow him to see Reynolds very often that summer, so he suggested that Reynolds seek further help from an organization called Family Children's Service Center in Westminster. Reynolds agreed and phoned for an appointment.

When Reynolds arrived at the Center, he spoke there with a woman named Marcia Meyer. Reynolds testified later, "She said that I had to be very honest with them, that they would take me on, that they had lots of patients like I was and they would—they could help." But Meyer told Reynolds that he would have to sign a form authorizing her organization to notify the police of any evidence implicating him as a child abuser. Reynolds asked Meyer about the form, and "she said you can't take counseling here unless you sign this because I cannot do it with you."[1]

---

1. Under Maryland law, "each health practitioner ... acting in a professional capacity, who has reason to believe that a child has been subjected to ... abuse, shall notify the local department or the appropriate law enforcement agency...." Maryland Code (1984, 1991 Repl.Vol.), Family Law Article, § 5–704(a)(1)(i).

Uncertain what to do, Reynolds telephoned the Carroll County State's Attorney's office and spoke with Assistant State's Attorney Kathi Hill. The call was unexpected, and Hill tried to be both cautious and candid. According to Reynolds, she told him, "Well, you should go and take your counseling right now, that's the first thing." Hill added, "It's been a long time since this occurred, but I cannot give you advice because if—I—it may, in the future,—I'm—I'm a prosecutor. I prosecute these types of cases."

Reynolds wanted help and assumed that all counselors would have the same policy about reporting to the police as did the Family Children's Service Center (the Center).[2] Accompanied by his wife, Agnes, he went to the Center and signed the form.

After Reynolds' counseling program was underway, Meyer called Reynolds and told him that the police wanted to talk with him. It was not part of the program, she said, and he did not have to discuss anything with the police if he did not want to. Still, Reynolds agreed to meet Corporal Richard E. Norman of the Maryland State Police at the Center. He agreed to speak with Norman, Reynolds later testified, because "that's what my children had told me they wanted; they weren't interested in prosecution or jail." On July 11, 1989, Norman came to interview Reynolds at the Center.

Norman introduced himself and told Reynolds that he understood "some statements" had been made to Meyer; would Reynolds now "tell me the same things?"

---

**2.** Conceivably, Reynolds could have considered going to another pastor for counseling on the theory that confidential communications to such an individual are not covered by the disclosure requirements set forth in § 5–704 of the Family Law Article. *See* Md.Code (1984, 1989 Repl.Vol.), Courts & Judicial Proceedings Art., § 9–111, and Family Law Art., § 5–705(a)(3). We express no opinion on whether such communications would, in fact, be protected, since that issue is not before us. We merely note that Reynolds did not pursue that possible alternative in his quest for counseling.

"Well," Reynolds replied, "whatever I tell you is goin' to incriminate me." Norman asked what he meant, and Reynolds explained, "Well, I'm an abuser—I'm considered an abuser."

At that point, Norman told Reynolds that he did not have to say anything. Reynolds then asked for "his rights," though he later testified that he had made this request "jokingly." Nevertheless, Norman obliged, reading the "Miranda rights" aloud from a printed card he carried.[3] According to his testimony, Norman also advised Reynolds that "he wasn't under arrest and he didn't have to talk to me; I mean, he didn't have to say a thing to me." Again, Reynolds acknowledged that he would be "incriminating" himself. The July 11 interview began and lasted "anywhere from fifteen minutes to an hour."

Reynolds talked about sexually touching all four of his daughters, starting with each when she was about ten years old. As for Crystal, there was more than touching; he had sexual intercourse with her periodically until she was well into her high school years. Reynolds told Norman where and how he might be able to contact his daughters.

After the interview, Norman pursued his investigation, eventually talking at length with Crystal and with Vivian, the second daughter. Over a period of time both women gave detailed accounts of how they were abused by their father. After a long interviewing session with Crystal on September 6, 1989, Norman decided to speak again with Reynolds. That afternoon, he went to Reynolds' home.

---

**3.** According to Norman, this is what he told Reynolds:

"You have the absolute right to remain silent. If you choose to answer, your answers can be used against you in court. You have the right to a lawyer. If you want a lawyer and cannot afford one, one will be provided for you. You have the right to talk privately with your lawyer before answering any questions and have him with you during the questioning. If you would like to answer questions without having a lawyer present, you have the right to stop at any time and obtain the services of a lawyer."

See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Reynolds was not there, so Norman waited. Shortly after 4 P.M. Reynolds showed up, and the investigator asked if he could speak with him because Crystal "had told me things." Reynolds said, "Fine," and the two men went inside.

According to Reynolds' testimony later, Norman "explained to me that he wanted me to try to remember the events as closely as I could and I couldn't understand that and he says, 'It's for Crystal's good because if you can't remember them, she doesn't think anybody believes her, that it didn't happen,' and so I was to try to remember because I would really be helping my daughter, that—she needed that for her own mental health...."

Eventually Norman's second interview with Reynolds began. This time, their conversation was tape-recorded.

"First of all, you're not under arrest, okay, like I told you a bit earlier," Norman advised Reynolds. "Same situation down in—in Ms. Meyer's office. All I want to do is just get some information from you, hear your side of the story again and, you know, you don't have to talk to me. If you want me to leave, I'll leave, you know."

Reynolds talked about his sexual episodes with Crystal and Vivian. At times he corroborated what his daughters had told Norman about some of the events; other incidents from the past he disputed or could not remember. When Norman began to follow up after Reynolds acknowledged threatening Crystal to get his way, Reynolds asked, "Well, why do you need those times?"

"Because I'm trying to verify what she's telling me," Norman responded.

"But you're not arresting me," continued Reynolds. "Why do you need to know every little detail?"

"Because it's important for her to understand," Norman replied, "you know, and that—that I can—I can say, yes, you know, I talked to your dad and—and he's saying that everything that happened...." At that moment, Reynolds interrupted Norman to get the phone. When he came back ten minutes later, Agnes was with him.

Norman reopened the interview with these words: "You realize I'm—I'm not gonna arrest you today. All I want to do is just talk to you, you know, and you're not under arrest and I can leave—you want me to leave any time you want, so I [inaudible] understand that. Do you understand that?" Reynolds indicated he did, and the conversation continued until just before 5:20 P.M.

Two days later, Norman returned and arrested Reynolds, who was eventually charged with several sexual offenses against Crystal and Vivian.

Before trial, Reynolds moved to suppress the incriminating statements he had made to Norman. The trial court denied the motion, finding that Reynolds had confessed freely and voluntarily to the State Police investigator. Neither Marcia Meyer nor anyone else from the Family Children's Service Center testified about anything Reynolds said in counseling. The only statements by Reynolds introduced into evidence were those he had made directly to Norman. After a two-day trial, a Carroll County Circuit Court jury found Reynolds guilty of second degree rape, two counts of second degree sexual offense, assault with intent to rape, assault with intent to commit second degree sex offense, and incest. On June 5, 1990, Judge Donald Gilmore sentenced Reynolds to a total of 50 years in prison.

Reynolds appealed, but the Court of Special Appeals affirmed the judgment against him. *Reynolds v. State,* 88 Md.App. 197, 594 A.2d 609 (1991). Reynolds petitioned this Court for a writ of certiorari, which we granted.

As was the case in the Court of Special Appeals, Reynolds' attack on his convictions focuses on the statements he gave to Norman. He challenges their introduction into evidence, claiming that they were the result of improper inducement and violative of his due process rights. In support of his contention, Reynolds relies on both constitutional and common law arguments. For the following reasons, we, too, decline to set aside his convictions.

## THE FIRST CONFESSION

Reynolds complains that what Assistant State's Attorney Kathi Hill told him during their brief telephone conversation induced him to confess. Therefore, he argues, his subsequent statements to Norman were involuntary. He further contends that Hill should have warned him about "the consequences of seeking counseling." Under Reynolds' reasoning, Hill's failure to do so led him to make admissions to the counselors, which in turn led to his admissions to Norman and thus rendered his statements inadmissible.

■ Reynolds bases his argument on both constitutional and common law voluntariness grounds. The State contends that the issue of common law voluntariness was waived because Reynolds failed to present it with specificity to the trial court; the Court of Special Appeals agreed. 88 Md.App. at 219–21, 594 A.2d at 620. Reynolds claims the issue was raised when, in his motion to suppress, he argued that his confession was admitted in violation of "other legal rights," citing a host of common law voluntariness cases including *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1980); *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979); and *Bellamy v. State,* 50 Md.App. 65, 435 A.2d 821 (1981), *cert. denied,* 292 Md. 376 (1982). Reynolds further asserts that he specifically adopted the arguments and points and authorities contained in his motion at the suppression hearing. Because Reynolds' common law voluntariness contentions are intertwined with his constitutional voluntariness contentions, we are going to assume that the issue was raised below. But we caution defense counsel that they must be precise when they craft such motions and when they argue them at suppression hearings. It is an attorney's obligation to present with clarity all issues that must be resolved by a trial judge, whose responsibilities include making sure that proper evidence is presented to those entrusted with determining guilt or innocence. In the future, we will be less inclined to review an issue such as the one on common law voluntariness that Reynolds says was included in his scat-

tergun motion but which was not specifically argued and clearly identified at the suppression hearing.

Originally common law confessions were admissible even if they had been wrung from hapless suspects by torture. W. LaFave & J. Israel, 1 *Criminal Procedure* § 6.2, at 439 (1984) (hereinafter *LaFave & Israel*). In 1775, Lord Mansfield first articulated what Wigmore would later characterize as the initial expression of the requirement that a confession be voluntary in order to be admissible against a criminal defendant. In that early elucidation, Lord Mansfield specifically referred to promises as one of the factors that might render a confession inadmissible. He stated:

> "The instance has frequently happened, of persons having made confessions under threats or promises: the consequence as frequently has been, that such examinations and confessions have not been made use of against them on their trial."

*Rudd's Case*, 1 Leach Cr.C. 115, 118, 168 Eng.Rep. 160, 161 (1775), *quoted in* 1 *McCormick on Evidence* § 146 (4th ed. 1992) (hereinafter *McCormick*). *See* 3 Wigmore, *Evidence* §§ 818–19 (Chadbourne rev. 1970) (hereinafter *Wigmore*). The common law approach was to identify inducements that might make a confession unreliable or even false. Actual or threatened physical harm, promises to be lenient upon conviction or not to prosecute, and deceptive interrogation came under scrutiny. *See LaFave & Israel* § 6.2, at 443.

■ Examination of a confession's "voluntariness" can be made both under a constitutional due process analysis and by application of state evidentiary laws. *See generally* 1 *McCormick* §§ 146–47, at 564–74. When analyzing whether a confession was voluntary under due process standards, "[t]he test is of the totality of the circumstances. All of the circumstances of the interrogation, and the particular characteristics of the accused must be examined. Generally, no one factor is dispositive." D. Nissan et al., *Law of Confessions* § 1:9 (1980, 1991 Cum.Supp.) (hereinafter *Law of Confessions*). "[W]hether [a] confession was obtained by coercion or improper inducement can be deter-

mined only by an examination of all of the attendant circumstances." *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963).

It is clear that coercion by government agents is a necessary ingredient to a determination that a defendant's confession should be suppressed because the defendant's constitutional due process rights have been violated. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473, 482 (1986).

Determining voluntariness under common law principles, as opposed to constitutional due process requirements, may require an additional inquiry. "Generally, the approach under the common law rule was to identify certain inducements which made a confession unreliable. These included actual or threatened physical harm, a promise not to prosecute, a promise to provide lenient treatment upon conviction, and deceptive practices so extreme that they might have produced a false confession." *LaFave & Israel* § 6.2, at 440. This Court has held that, regardless of constitutional imperatives, Maryland law demands that confessions "be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard*, 286 Md. at 150, 406 A.2d at 418.

In harmony with the approach taken in federal constitutional analysis, Maryland has for the most part applied a "totality of the circumstances" rule when appraising the voluntariness of confessions under state nonconstitutional law. *See Hoey v. State*, 311 Md. 473, 483, 536 A.2d 622, 627 (1988); *Lewis v. State*, 285 Md. 705, 721, 404 A.2d 1073, 1081 (1979). *See also State v. Kidd*, 281 Md. 32, 36, 375 A.2d 1105, 1108, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

One area that has attracted special attention with respect to voluntariness—both under common law and con-

stitutional due process requirements—concerns promises made to suspects being interrogated. 1 *McCormick* § 154. It is the defendant's sensitivity to inducement while in custody and the potential impact of the promise of leniency that render the confession inadmissible. Courts abhor, or at least find distasteful, promises of leniency or immunity made by state agents to defendants subject to the vulnerability of custodial interrogation. In contrast, however, courts permit and perhaps even encourage promises of leniency through reduced charges or lower sentences made by prosecuting attorneys that induce criminal defendants to admit their culpability and plead guilty. *Cf. Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986).

The reasons that promises of leniency may render a confession inadmissible were discussed by the Supreme Court in *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970):

"[When] a confession [was] given by a defendant in custody, alone and unrepresented by counsel ... even a mild promise of leniency was deemed sufficient to bar the confession ... because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess."

*Id.* at 754, 90 S.Ct. at 1472, 25 L.Ed.2d at 759.

In *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Supreme Court made it clear that constitutional voluntariness does not require that all promises, threats, or inducements render a confession involuntary; instead, the federal constitution requires only that courts consider promises, threats, or inducements as part of the totality of the circumstances that courts must look at to determine voluntariness.

In *Law of Confessions,* the authors observed that state courts developed a per se rule of exclusion to apply when the following elements were met in cases involving promises of leniency or immunity:

"1. Promise of benefit or advantage.

2. Made by a person of official or apparent official authority.

3. The suspect would not have confessed but/for the promise.

4. The suspect's conclusion that he had received an offer was objectively reasonable."

*Law of Confessions* § 1.12, at 23–24. In the 1991 supplement to their work, however, they note that there is "a pronounced trend away from" per se exclusion and "toward a totality of the circumstances approach." *Id.* § 1:12, at 13 (1991 Cum.Supp.). McCormick also notes that judicial rejection of the per se analysis in favor of a totality of the circumstances approach has increased the need for determining the impact of promises on particular defendants in particular interrogations. 1 *McCormick* § 154, at 615. *See State v. Strain,* 779 P.2d 221, 227 (Utah 1989) (Case remanded for a determination whether, under the totality of the circumstances, the defendant was so affected by improper promises that his confession was involuntary). In 1987, after holding a confession voluntary notwithstanding a firm promise of leniency made by the police, the Seventh Circuit noted:

"[A]lthough it was at one time suggested that any indication of leniency was both a necessary and a sufficient condition of a finding of involuntariness (*Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.E.[Ed.] 568[, 573] (1897)), the law today is that such an indication is a necessary but not itself a sufficient condition. Or to borrow a familiar concept from another area of the law, it is not enough for the indication of leniency to bear a but-for relationship to the confession in a purely temporal sense (that is, simply to show the defendant would not have considered confessing had the police not raised the subject by speaking of potential benefits). Instead the but-for test is one of proximate cause in the overborne-will sense: whether the police promise caused a deprivation of free will on the part of the then suspect."

*Cole v. Lane,* 830 F.2d 104, 109 (7th Cir.1987), *cert. denied,* 484 U.S. 1076, 108 S.Ct. 1053, 98 L.Ed.2d 1015 (1988). See also *Green v. Scully,* 850 F.2d 894 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988), where the court said:

> "A reading of our own decisions reveals that the presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision.... Other circuits also conclude that promises do not require an analysis separate from or different than the totality of circumstances rule.... Thus, the inquiry in each case is whether such a promise overbears a suspect's will, as the promise of leniency did in *Bram,* either alone or in conjunction with other factors." (Citations omitted).

850 F.2d at 901.

Maryland has followed the old common law rule, which has seemed to adopt a per se exclusion rule that official promises of leniency to a defendant in custody that induce a confession render the confession inadmissible. In a line of Maryland cases reaching back into the last century, this Court has explored challenges to the voluntariness of statements made by suspects who had been offered promises. If a confession "had been induced by any threat of harm, or promise of worldly advantage held out to him by [the interrogating detective], or by his authority, or in his presence and with his sanction, it ought to be excluded." *Nicholson v. State,* 38 Md. 140, 153 (1873).

A mere exhortation to tell the truth is not enough to make a statement involuntary. *See Ralph v. State,* 226 Md. 480, 486, 174 A.2d 163, 166 (1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962). *See also State v. Rochester,* 301 S.C. 196, 391 S.E.2d 244, 247 (1990) (Polygraph examiner's statement that it would be in suspect's interest to tell the truth did not offer a "hope of reward or benefit."). An entreaty to "tell the truth" coupled with a

promise that there would be benefits to the suspect, how-ever, can render the statement involuntary. In *Biscoe v. State,* for example, a confession was inadmissible because the suspect was told "that it would be better for him to tell the truth, *and have no more trouble about it.*" 67 Md. 6, 7, 8 A. 571, 572 (1887) (emphasis added). The declaration, "Tell the truth about it. You've got nothing to fear *if* you tell the truth, and you weren't in it," was also seen as an improper inducement by a plurality of the Court in *State v. Dobbs,* 148 Md. 34, 61, 129 A. 275, 286 (1925) (Offutt, J., concurring) (emphasis added). For a discussion of the dif-ference between exhortations and inducements, see *Clark v. State,* 48 Md.App. 637, 644–45, 429 A.2d 287, 292, *cert. denied,* 291 Md. 773 (1981).[4]

From our precedents, we distilled the following common law principle on promises:

> "[I]f an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his decla-ration will be considered to have been involuntarily made and therefore inadmissible."

*Hillard v. State,* 286 Md. at 152–53, 406 A.2d at 420. "The rule in *Hillard* announces that a statement is rendered

---

4. In *People v. Hill,* 66 Cal.2d 536, 58 Cal.Rptr. 340, 348, 426 P.2d 908, 916 *cert. denied,* 389 U.S. 993, 88 S.Ct. 492, 19 L.Ed.2d 487 (1967), and 390 U.S. 911, 88 S.Ct. 838, 19 L.Ed.2d 884 (1968), the Supreme Court of California said that police exhortations to a suspect to tell the truth without threats or promises did not render a confession involuntary. The suspect in that case had been urged to "help himself" by consider-ing his own interests against those of his codefendants.

> "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible."

*Id.*

involuntary if it is induced by any official promise which redounds to the benefit or desire of the defendant." *Stokes v. State*, 289 Md. at 160, 423 A.2d at 554. One common thread that runs through our cases is that the promise must have caused the suspect to confess. If a suspect did not rely on an interrogator's comments, obviously, the statement is admissible regardless of whether the interrogator had articulated an improper inducement. By definition, there would have been no "inducement" at all, because the interrogator "induced" nothing. See *Ralph v. State* in which we said, "[T]he court besides finding out whether an inducement held out to the accused should also ascertain whether he had been influenced by such inducement in making the confession." We noted that there was nothing in that case "to show what *effect* the statement had on the defendant." 226 Md. at 486–87, 174 A.2d at 166 (emphasis added). *See also State ex rel. Collins v. Superior Court*, 145 Ariz. 493, 702 P.2d 1338, 1340 (1985) ("[T]he promise must *induce* the defendant to waive his fifth amendment rights. If defendant did not rely on the promise, he certainly was not induced by it to make a statement.") (Emphasis in the original).

We note that Hill was responding to Reynolds' unsolicited telephone call; Reynolds was not under any kind of custodial restraint or compulsion. Furthermore, there was no inducement by Hill. She did not promise Reynolds any advantages or benefits. In fact, she promised him nothing. All Hill did was recommend that Reynolds receive counseling and warn that she could not give him advice because she might be called upon to prosecute him in the future. Hill certainly never suggested that Reynolds talk with the police. If anything, Hill's comments were a further indication to Reynolds that he could be held criminally liable for sexually abusing his daughters.[5] Without a promise of benefit or advantage, there was no inducement.

---

5. Had Hill truly embarked on a course of offering legal advice to Reynolds that induced him to confess, she might have crossed the line

We note further that nothing Reynolds said to Hill or at the Center became evidence at his trial. Even assuming that Hill's comments were an inducement to seek counseling, what he said to Meyer or any counselor at the Family Children's Service Center was not used against him in court. The confessions at issue were made to Corporal Norman much later and were completely independent of the brief telephone conversation between Reynolds and Hill.

In trying to link Hill's comment to his subsequent confession to Norman, Reynolds reaches a bit too far. We would have to accept that the prosecutor not only coerced or induced him into talking to the counselor at the Center, but also coerced or induced him into confessing to Corporal Norman at a later date after his counseling was well underway. Arguably, Hill may have induced Reynolds to speak to the counselors; in no way did she attempt to induce him to speak to the police. Even assuming improper conduct by the prosecutor, any taint is so attenuated by the time Corporal Norman interviewed Reynolds—preceded by both the investigator and Meyer advising Reynolds he did not have to talk to the police—that exclusion is not appropriate. There is no established link between the alleged inducement to talk with counselors at the Center and Reynolds' decision to speak with Corporal Norman.

Whatever the prosecutor did, Reynolds gave his first statement to Norman after having received his *Miranda*

into impermissible conduct. In *Martin v. Wainwright,* 770 F.2d 918, 927 (11th Cir.1985), *modified,* 781 F.2d 185, *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986), the court said it was "troubled" by allegations that an assistant state's attorney named Jack Scarola gave legal "advice" to a criminal suspect being interrogated. Scarola had told the suspect that a confession might be of value to him at the capital sentencing phase of his trial and that "it is only the truth that can help you." Although the court found that "[a]s a prosecuting attorney, Scarola should not have engaged in such discussions with a soon-to-be defendant," it concluded that the prosecutor's "indiscretions" did not render the confession involuntary. Nothing that Hill did even comes close to the conduct before the court in *Martin v. Wainwright.* And, of course, Scarola was involved in the interrogation of a suspect, while Hill was merely responding to an unsolicited query from someone she had never heard of.

rights and being told by Meyer that he did not have to talk to police. In neither his conversation with Hill nor his interview with Norman was Reynolds under any compulsion to confess, and he was offered no inducements affecting the voluntariness of his statements. In short, nothing Assistant State's Attorney Hill did or said led Reynolds to admit his crimes to the police, whether one analyzes the evidence from a per se rule or a totality of the circumstances approach.

## THE SECOND CONFESSION

The second interview, which occurred at Reynolds' home nearly two months after the initial session with Norman, is also a target of Reynolds' attack. By this time, Norman had interviewed both Crystal and Vivian and was apparently well on his way to developing a case against their father. Reynolds invited the investigator inside and agreed to talk. Norman told Reynolds that he was not going to arrest him that day and that he could stop the interview and tell him to leave any time he wished. He did not, however, reiterate the full *Miranda* rights as he had done at the Center; he said merely that it was the "same situation down in Ms. Meyer's office."

Reynolds contends that Norman should have fully advised him of his rights before the second interview. We reject his argument and adopt the well-reasoned analysis of the Court of Special Appeals, which held that *Miranda* warnings were unnecessary because there was no custodial interrogation. 88 Md.App. at 207–13, 594 A.2d at 614–17.

Reynolds also contends that Norman improperly induced him to talk by indicating the truth would "help" Crystal. We disagree. What Norman may have implied was that the statement might be for Crystal's benefit—not for Reynolds' benefit. At most, any reward would be a purely collateral benefit. Promises of purely collateral benefits do not generally reach a level that undermines the voluntariness of a confession.

" '[I]n general such promises [of only "collateral" bene-
fits] are less coercive to the accused than promises direct-
ly relating to the criminal proceedings at hand.' Some
courts ... apparently regard the collateral nature of the
promised benefit unworthy of consideration or even com-
ment." (Footnotes omitted.)

1 *McCormick* § 155, at 616–17 (quoting *Miller v. Fenton,*
796 F.2d 598, 610 (3d Cir.), *cert. denied sub nom., Miller v.
Neubert,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986)).
Generally the type of inducements that rendered confes-
sions inadmissible at common law were inducements ex-
treme enough to make the confessions unreliable and which
directly impacted on the accused or the crime charged.
*LaFave & Israel* § 6.2, at 440.

In *Stokes v. State,* this Court suppressed a statement
from a suspect who had been promised what may have been
both a direct and collateral benefit—that his wife would not
be arrested and charged as a codefendant if he told the
police where illicit drugs were hidden. 289 Md. at 157, 423
A.2d at 553. In that case, and in the cases cited therein, the
inducements concerned what the *police* would or would not
do if the defendant made a statement. It was the threat of
the authorities to cause the defendant distress and anguish
that created the coercive atmosphere. We added, "Neither
Maryland nor any other jurisdiction of which we are aware,
however, goes so far as to say that a confession motivated
solely by a defendant's sense of altruism, without the
inducement of an official threat or promise, is involuntary."
289 Md. at 161, 423 A.2d at 555. *See also Rogers v. State,*
89 Md. 424, 43 A. 922 (1899). In *Rogers,* a brother and
sister were both being simultaneously interrogated about a
homicide. The brother confessed to the murder after hav-
ing been told by police "if your sister is innocent you are
the only one who knows so, and it is your duty as a man to
tell what you know about it...." 89 Md. at 426–27, 43 A.
at 923. This Court upheld the admissibility of the confes-
sion because there was neither threat, promise, nor any
*quid pro quo* posited by the police officer's statement.

In the instant case, Norman made no express or implied threat or promise to take official action or refrain from taking official action depending on whether Reynolds made a statement. Thus, "where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate the ... [statement]." *Stokes v. State,* 289 Md. at 162, 423 A.2d at 555–56 (alteration in original) (quoting *People v. Steger,* 16 Cal.3d 539, 128 Cal.Rptr. 161, 168, 546 P.2d 665, 672 (1976) (*en banc*). *See also Finke v. State,* 56 Md.App. 450, 485–86, 468 A.2d 353, 371–72 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218, *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984).

Reynolds does not contend that Corporal Norman was untruthful when he relayed Crystal's concern that her allegations might not be believed. Merely relaying this to Reynolds was not an "improper" inducement. *See Wright v. State,* 307 Md. 552, 515 A.2d 1157 (1986) (discussing inducements and the requirement that an inducement be "improper.").

At most, Norman implied that, by confessing, Reynolds would allay Crystal's self-doubt and concern that no one would believe her. This may have triggered Reynolds' "sense of altruism," but it was not the type of inducement that would mandate suppression. There was no promise or threat of official action if Reynolds did not confess. The trial judge did not err in refusing to suppress the second confession.

## CONCLUSION

In sum, we do not find that any action on the part of the prosecutor or the police investigator subverted Reynolds' freedom to decide whether or not to make his incriminating statements. What Reynolds told Norman—and what was used eventually at his trial—was voluntary.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE

COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.

ELDRIDGE, J., concurs in result only.