REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2653

September Term, 2012

GREGORY EMILIE SMITH

v.

STATE OF MARYLAND

Meredith,
Graeff,
Leahy,

JJ.

Opinion by Leahy, J.

Filed:  December 1, 2014

During a post-arrest interview, Appellant Gregory Emilie Smith waived his *Miranda* rights and then described multiple occasions on which he engaged in "consensual" anal intercourse with four-year-old K.N.[1] Before his trial, Appellant moved to suppress this confession, claiming that it was involuntary and obtained in violation of Maryland's common law rule prohibiting law enforcement officers from promising or implying that a suspect will gain the advantage of non-prosecution or some other form of assistance in exchange for a confession. In denying this motion, the Circuit Court for Montgomery County concluded that no reasonable layperson would believe that they would be afforded leniency upon confessing to "consensual" anal sex with a four-year-old. At trial, Appellant's recorded confession was played for the jury, and on May 3, 2012, the jury convicted Appellant of one count of sexual abuse of a minor, two counts of first-degree sex offense, and one count of second-degree child abuse. In his timely appeal, Appellant presents only one question:

"Did the lower court err in denying Appellant's motion to suppress?"

We affirm. We find that the law enforcement officers made no explicit promises, and that a reasonable layperson in Appellant's position would not have inferred from the officers' statements that he could gain the advantage of non-prosecution or leniency by confessing to "consensual" anal intercourse with a four-year old. *See Hill v. State*, 418 Md. 62, 77 (2011).

---

[1] We do not name the minor victim in this case. *See Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 458 n.2 (2002).

A. The Interview

Appellant was arrested on September 14, 2010, in the District of Columbia on an outstanding warrant. Detectives Michael Carin and Errol Birch of the Montgomery County Police went to the D.C. police station to interview Appellant. The DVD recording of the interview shows Appellant wearing what appears to be sleepwear. He is not handcuffed, but one of his legs is restrained to a device attached to the floor. The interview room contains one desk and three chairs. Although the detectives are in plainclothes, it is unclear from the video whether the detectives were armed. Both of the detectives, as well as Appellant, spoke in clear, calm voices throughout the interview, and there is no indication that Appellant was threatened in any way.

The detectives introduced themselves as police officers, told Appellant that they wanted to interview him about K.N., and then read Appellant his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant acknowledged that he understood his rights, agreed to speak with the detectives, and then initialed and signed the Advice of Rights Form.

Appellant told the detectives that he was a computer programming student at Strayer University. He also said he was not on any medications at that time, which was noted as 9:10 a.m. He confirmed that a "couple of years ago" he lived in an apartment on Georgia Avenue with Maria N. and her children, K.N. and D.N.

Detective Carin explained the allegations: "Okay. There's no way to sugarcoat this, because the information that we have seems pretty bad, okay? Basically, she disclosed to her Mom . . . Okay. K.N. and D.N were interviewed last week, and basically they were talking about . . . you beat him up one day; and . . . you engaged K.N. in anal intercourse. Okay. That's basically why we are here." The detectives detailed K.N.'s accusations, including that Appellant engaged in this behavior on multiple occasions. They also indicated they had an eyewitness.

Detective Carin told Appellant that he and Detective Birch did not execute warrants or work on robbery cases, but they had to attend school to learn how to be more like social workers. He continued, "[O]ur main job isn't to put cuffs on you and throw you in jail. . . . [o]ur goal is to get the counseling for her so she can become whole again." In order to do that, he explained, they "have to have an understanding of what happened." He then queried, "you and I know it wasn't her fault, correct?" Appellant replied, "I don't even know what you're talking about. I never once put my hands on a little girl." After Detective Carin stated that "the bottom line is you and I know it happened," Appellant replied, "No, it didn't."

Next the detective told Appellant that not only did they have an eyewitness, but that a doctor examined K.N. and "there's damage to her [anus]."[2] Appellant responded, "I

---

[2] There was, in fact, no physical evidence of the abuse after several years had passed. However, as the State correctly points out in its brief, police deception may be a legitimate investigative technique where it does not rise to the level of an "'overbearing inducement.'" *Whittington v. State,* 147 Md. App. 496, 520-21

don't care if it happened to her.  It wasn't by me." The detective then challenged Appellant's story, relating that K.N. identified Appellant as the perpetrator; Maria talked about the time when Appellant beat up D.N.; there was a medical report; and a witness walked in on Appellant and K.N.  The detective stated, "you know exactly what I'm talking about," Appellant replied, "No, I don't.  I really don't."

It was at this point, approximately 18:24 minutes into the interview, when the discussion took a direction that is the subject of this appeal.  Detective Birch took over questioning:

> You know, this is the one thing that you got to understand, and I'm going to throw out another card to you, okay?  When we do these cases, the most important thing is for you to stand up and be a man and accept your responsibility.
>
> The problem we have is, when we get these cases – we get these cases every day.  And a lot of these girls, depending on the age of the boys, we polygraph them.
>
> The part we had a problem with is she's saying you forced her, you forced her.  Force is a huge thing.  That's the problem that I have, when someone says they were forced.
>
> *   *   *
>
> Part of the polygraph that she passed was she did have anal intercourse with you.  The part that she did not do well on is the force.  This is the opportunity for you – if there was force, we have a problem; if there's not force, then it's consensual, and that's when she get's [sic] help.  Then we understand that she is not telling us the truth about that part.
>
> But sitting here, saying it didn't happen with all these things here – It basically is going to be her story jamming you, and this is your opportunity, if it was not force, then you need to tell us, because what happens is you walk out of here, we're going with the force.

_____

(2002) (quoting *Ball v. State*, 347 Md. 156, 178 (1997)).

4

At 19:45 minutes into the interview, Detective Birch then made the following statements that are the primary focus of Appellant's arguments:

And you get that shit all the time, "I was raped and I was forced." Well, you're going to get in trouble for that. If it was consensual, that's a whole different story.

That's what we're trying to figure out, is it force or was it consensual? And that's what, and by sitting here and saying, "I don't know what happened to her," you can do that, you can throw the dice on that table, see if you're going to win this – you're not going to win. We're going to go forward on force.

Here is the opportunity to tell us it was not force, it was consensual. There's a little difference in age and that's just something that we got to deal with and she has to deal with, and she's going to have to make better choices in the future.

But the force part is what we're hung up on.

I'm going to tell you what. If she said it was consensual and she passed that, we wouldn't come down here. It took us two hours to get down here to talk to you, to give your side of the story. It took me two hours to get down here. If she said it was consensual and passed that polygraph, we wouldn't have come down here.

The force part is the one that we were concerned about.

Following this, and only 20:50 minutes into the interview, Appellant stated, "I never forced her to do anything." Immediately thereafter, the following transpired:

Detective Birch: Okay. Tell me what the consensual part of it was and we can roll out of this. If it's consensual, then tell us it's consensual.

[Appellant]: It was consensual.

Appellant then recounted details of having anal intercourse with K.N., claiming that "[i]t was her idea." He stated that K.N. cried one time, and he stopped. Appellant did not

5

remember D.N. walking in on them. Appellant stated that the incidents began when K.N. was four or five years old and that there were four or five such encounters with K.N. over a six-month period.

Detective Carin revealed that K.N. told the police that Appellant put a plastic bag over her head. Appellant responded that "[t]here was never a plastic bag," and explained that he put a pillowcase over her head because "[s]he said she didn't want to see anything."

The detective also questioned Appellant about the incident regarding D.N. Appellant claimed that he and D.N. were "just roughhousing in the house and it was an accident." Appellant admitted that he hit D.N. with an open hand, but maintained that it was accidental. When asked about a reported injury to K.N.'s ear, Appellant stated that he was chasing her "to be disciplined for something she did, and she ran into the wall." He denied throwing her or smacking her, but he confirmed that K.N.'s ear bled after this incident.

Appellant denied that he engaged in oral sex with K.N., but admitted that he placed his finger in her vagina and her anus "[j]ust once or twice." He further asserted that K.N. "always initiated" the encounters and that K.N. "came and got [him]." Appellant disclosed that after their encounters, he "told her not to tell anybody because people don't understand."

Appellant agreed he would write an apology to K.N. After 32:29 minutes, the following dialogue was recorded:

Detective Birch: Okay.  Let me ask you this.  Do you know what you did was wrong?

[Appellant]: (No audible response.)

Detective Birch: Do you know it was illegal?

[Appellant]: (No audible response.)

Detective Birch: Do you know it was illegal no matter whether it was consensual or not?

[Appellant]: (No audible response.)

Detective Birch: So really the bottom line is no matter whether she said, "Let me [f___] you," doesn't make a difference.  You're still 100 percent wrong.  You're aware of that, correct?

[Appellant]: (No audible response.)[3]

Appellant was then left alone to write the apology letter.  The transcript of the interview then concluded approximately 33:40 minutes after it began.

Thereafter, as shown on the DVD recording, about 43:20 minutes after the interview began, Detective Carin returned to the interview room, gave Appellant a bottle

---

[3] Although the court does not, in its rulings, articulate its impressions of the DVD recording, we discuss the DVD to the extent that it informs our reading of the transcript, including the nonverbal conduct of both Appellant and the police.  *See Williams v. State*, ___ Md. App. ____, ___, No. 651, Sept. Term 2012, slip op. at 32 n.11 (filed Oct. 1, 2014).  Here, on the DVD recording, Appellant is nodding his head affirmatively where the transcript indicates "(No audible response.)"  The fact that Appellant nodded his head on the DVD was called to the court's attention by counsel during the first hearing on the motion to suppress on March 9th.

7

of water, and asked him to sign his apology.  Detective Carin asked Appellant to read his

apology letter aloud, and he did so:

> Dear [K.N.]:  I just wanted to say that I'm sorry for what I did to you.  I
> don't know why I didn't just tell you no when I had the chance.  If I could
> go back and change what I did, I would.  Please know that none of this is
> your fault so don't blame yourself for what happen [sic] because you didn't
> anything wrong [sic].  Again I'm sorry and I hope you can put this behind
> you and live your life in peace.

When Detective Carin asked Appellant if this letter was referring to the anal intercourse

with K.N., Appellant responded, "right."

Appellant inquired about what would happen next, and the detective explained that

he would be transported to D.C. Central Booking and that he was charged with second-

degree sex offense, second-degree assault, and sex abuse of a minor as to K.N., and

second-degree child abuse as to D.N.[4]  Detective Carin also told Appellant that he could

not take him back to Maryland and that there would be an extradition hearing at some

point in D.C.  After a few more clarifying questions, wherein Appellant maintained that

he never put a plastic bag over K.N.'s head, Appellant was left alone, approximately

48:15 minutes after the interview began.

B.  The Suppression Hearing

On March 9, 2012, the circuit court (the "suppression court") held a hearing on

Appellant's Motion to Suppress.  At the outset, the parties stipulated that Detectives Carin

and Birch had no contact with Appellant other than what was documented in the

---

[4] Appellant was ultimately charged with multiple counts of first- and second-degree sexual offenses and related offenses.

transcript and by the recording.[5]   Neither Detective Carin nor Appellant testified at the hearing, although both were present.

Appellant's counsel argued that his client's confession was involuntary because the officers made a promise of leniency and his client relied on that improper inducement. Counsel offered as an improper inducement the following statement: "Okay. Tell me what the consensual part of it was and we can roll out of this."  The suppression court inquired, "how could it be that a reasonable person in the position of your client would have inferred from the detective's statement that he could gain . . . the advantage of non-prosecution or other form of assistance by, if it [sic] was having consensual sex with a 4-year-old?" The suppression court further queried, "objectively how could a layperson believe a 4-year-old could consent to anything?"  Appellant maintained that the inquiry was simply whether the police promised him something, and whether he relied on that promise in making a statement.   Appellant's counsel asserted that "[h]e doesn't have to know whether it's illegal or not."

The State responded that Appellant was arrested, held in custody, advised of his *Miranda* rights, and then told what the allegations against him were before he made his confession.  It was not objectively reasonable for Appellant to believe that a four-year-old could consent to anal intercourse, or that by saying so, Appellant would gain any

---

[5]
    As to the evidentiary portion of the hearing, the suppression court stated that it had read the transcript and, after defense counsel expressly stated that there was no objection to the court's consideration of the DVD recording, declared the evidentiary record closed.

9

advantage.  The State contended that the detective's statement "…we can roll out of this" must be read in context.  They had told Appellant they had traveled two hours to get his side of the story, so the detectives wanted to be done and roll out of there:

> THE COURT:  You're saying what the detective meant, "All right, tell me it was consensual so I and my colleagues can go back to Montgomery County?"
>
> [THE STATE]: Not just what he meant, that's what he said.  "We will roll.". . . He didn't say, "you will roll out of here."

The suppression court engaged in extensive discussion with counsel over application of the relevant Court of Appeals' decisions to the facts presented, and ultimately denied the motion, explaining:

> My conclusion, taking the transcript at face value, I mean, I conclude that no reasonable layperson in the position of the defendant would have inferred from the detective's statements that he could gain the advantage of non-prosecution or some other form of leniency in this context because no reasonable person would believe that one can lawfully, under any circumstances, have sex with a 4-year-old.  To me, that is the linchpin of the case.
>
> I could conjure other fact patterns, and I've discussed some of them with counsel, which could come down on one side of the ledger or the other side of the ledger, but, respectfully, not this one.

On April 27, 2012, the suppression court held a hearing on Appellant's motion to reconsider.  Most of the argument concerned conflicting interpretations of *Hill v. State*, 418 Md. 62 (2011), beginning with the following inquiry by the suppression court:

> [COURT]:  If it's reasonable [under *Hill*] on the one hand for someone to cough it up because they're told, "If you give the 9-year-old an apology you won't be prosecuted," how different is that?

10

> [THE STATE]:   Under *Hill* they are promising him an explicit benefit of, "We are not going to go forward," Here, they never make that promise to [Appellant].  Never make that promise to [Appellant].

The suppression court held the matter *sub curia* and reconvened on April 30, 2012, the same day the jury was selected for trial.

After permitting even further argument, the suppression court denied the motion for reconsideration. In so ruling, the court found that at the time of the interview, Appellant was indicted and under arrest, and that he was advised of and waived his *Miranda* rights.  Paraphrasing the Court of Appeals in *Hill,* the court acknowledged that the question before it was "whether a reasonable layperson in the position of the defendant would have inferred from the detective's statement that he could gain the advantage of non-prosecution or some other form of assistance."  The suppression court explained:

> I understand what was decided in *Hill*, but I think there are important . . . factual differences between the *Hill* case and this case, some of which I've already recited, others of which are the nature of the detective's statements and the circumstances under which they were made and the crimes at issue. Here, one distinguishing feature I see is while it is certainly illegal to have consensual sex with a minor, it's a different crime if that consensual sex was accompanied by force.  The force elevates it to first degree.  I'm not saying it makes it better or worse, but it's different.  So that is one legitimate area where the police were trying to find out what they had was whether it was a first degree offense or not a first degree offense, but that doesn't mean it wasn't an offense. [6]

---

[6] As demonstrated by the foregoing facts, the detectives had received information from K.N. that Appellant put a plastic bag over her head, which would classify the crime as first-degree sex offense under Md. Code (2002, Repl. Vol. 2012), Criminal Law Article ("CL"), § 3-305 (prohibiting forceful, nonconsensual sexual acts while suffocating).  Without the bag, the crime would be second-degree sex offense under CL § 3-306 (2002, Repl. Vol. 2012 & Supp. 2013).  Although determining whether a bag was involved was a legitimate inquiry, the issue before us is not simply whether the topic of questioning was appropriate; rather, as will be discussed *infra*, the issue is whether the detectives improperly promised or implied leniency in exchange for a confession.

The court concluded by denying the motion, stating that it was "objectively unreasonable" for:

[T]his defendant . . . to have believed that if it was consensual: A, it would go away; B, he'd be released from D.C. jail; C, it wouldn't be a crime. It would be a crime. It'd be a different crime. It wouldn't be a first degree crime, it wouldn't [sic] be some other crime, second degree, third degree, but it's still a crime.

The notion that a reasonable person would or could believe that having consensual sex with a 4-year-old is not problem, or that if I just say it's consensual not only, even if it all doesn't go away it's going to be materially better is a notion which I frankly think is absurd.

C. <u>Trial and Disposition</u>

At Appellant's trial, the State played the recorded statement for the jury, and on May 3, 2012, the jury ultimately convicted Appellant of one count of sexual abuse of a minor, two counts of first-degree sex offense, and one count of second-degree child abuse.[7] On January 31, 2013, the circuit court imposed the mandatory minimum sentence of 25 years without possibility of parole for both counts of first-degree sex offense, each to be served consecutively, a consecutive sentence of 25 years for sex abuse of a minor, and a concurrent sentence of 15 years for second-degree child abuse. Appellant filed a Notice of Appeal on February 12, 2013.

**II.**

The sole issue on appeal is the voluntariness of Appellant's custodial confession. Appellant contends that Detective Birch's statements constituted an improper inducement and that Appellant relied on those statements in making the confession. The State

---

[7] The jury acquitted Appellant of the charge involving D.N.

12

counters that Appellant's statement was voluntary for several reasons. First, unlike the accused in *Hill*, here Appellant was arrested, and only after he waived his *Miranda* rights and heard the allegations leveled against him did he volunteer that he had "consensual" intercourse with a child. Second, the State argues that the detectives did not explicitly make a promise or convey an improper inducement to Appellant. And finally, the State contends that no reasonable layperson would believe that confessing to "consensual" anal intercourse with a four-year-old would not result in prosecution or that such a confession would result in the filing of a lesser charge.

The issue of whether a confession is voluntary constitutes a mixed question of law and fact. *Winder v. State*, 362 Md. 275, 310 (2001). The Court of Appeals has explained this amalgam as follows:

> If the trial court determines that the statement was not made voluntarily, it will declare it inadmissible. That completely resolves the issue; it never becomes one for the jury. If, on the other hand, the court finds the statement voluntary, it will admit it and its voluntariness then becomes an issue which the jury must ultimately resolve.

*Hof v. State*, 337 Md. 581, 605 (1995) (internal citations omitted). As a result, we review the court's ultimate ruling on the issue of voluntariness *de novo*. *Winder*, 362 Md. at 310-11. We are limited to the facts presented at the suppression hearing, and we must view the "'evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party.'" *Lee v. State*, 418 Md. 136, 148 (2011) (quoting *Owens v. State*, 399 Md. 388, 403 (2007)); *see also Williams v. State*, 212 Md. App. 396, 401 n.3 ("When we review a circuit court's disposition of a motion to suppress, we look exclusively at the record of the suppression hearing, view the evidence in the light most

favorable to the prevailing party on the motion, and defer to the fact findings of the suppression judge unless clearly erroneous; however, we review the ultimate question of constitutionality *de novo.*" (citing <u>*Walker v. State,* 206 Md. App. 13, 22–23 (2012)</u>)), *cert. denied*, 435 Md. 270 (2013).

A confession may be admitted against an accused only when it has been "determined that the confession was '(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights,[8] and (3) elicited in conformance with the mandates of *Miranda*.'" *Ball v. State*, 347 Md. 156, 173-74 (1997) (quoting *Hof*, 337 Md. at 597-98), *cert. denied*, 522 U.S. 1082 (1998); *accord Lee*, 418 Md. at 158; *Knight v. State*, 381 Md. 517, 531-32 (2004). Appellant challenges the voluntariness of his confession under Maryland common law.

The common law rule in Maryland is that "a confession is involuntary if it is the product of certain improper threats, promises, or inducements by the police." *Lee,* 418 Md. at 161 (citing *Knight*, 381 Md. at 532). In assessing the voluntariness of a statement generally, we have traditionally examined "the totality of the circumstances affecting the interrogation and confession." *Hill,* 418 Md. at 75 (citing *Knight*, 381 Md. at 532). "A non-exhaustive list of factors to consider in that analysis includes the length of interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education, and experience of the suspect." *Id*.

---

8
     Under constitutional law, confessions that are "the result of police conduct that overbears the will of the suspect and induces the suspect to confess" are prohibited. *Lee*, 418 Md. at 159 (citing *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)). The Court of Appeals has noted that not all deceptive practices meet this test, and that not all promises, threats, or inducements render a confession involuntary; rather, courts must consider the totality of the circumstances. *Id*. at 159-60.

(citing *Williams v. State,* 375 Md. 404, 429 (2003)). These factors, however, do not share equal weight in our common law analysis; some are "transcendent and decisive." *Williams*, 375 Md. at 429. "[A] confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, *notwithstanding any other factors that may suggest voluntariness*, unless the State can establish that such threats or promises in no way induced the confession." *Id.* (emphasis added); *see also Andrew V. Jezic et al., Maryland Law of Confessions* § 3:1, at 68-71 (2013) (discussing the Court of Appeals' departure from the traditional "totality of the circumstances" analysis under the common law approach).

In *Hillard v. State*, the Court of Appeals reaffirmed Maryland's exclusionary rule governing custodial confessions improperly induced by law enforcement:

> [U]nder Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

286 Md. 145, 153 (1979). Subsequently, the Court fashioned a two-part test based on *Hillard* for examining whether a confession was involuntary under Maryland common law. *Winder*, 362 Md. at 309. The first prong is whether "a police officer or agent of the police force promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession." *Id.* This prong of the test is objective. *Id.* at 311. To resolve whether the officer's conduct satisfies the first prong, "the court must determine

15

whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration." *Hill*, 418 Md. at 76. "An accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under this prong." *Hill*, 418 Md. at 76. A "threat, promise, or inducement can be considered improper regardless whether it is express or implied[,]" *id.* (citing *Winder*, 362 Md. at 308), and the "reasonable layperson" inquiry may not be necessary in cases involving an express *quid pro quo*.[9]

---

[9] *Compare Knight*, 381 Md. at 537 (concluding that an officer's statement that "if down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," was "clearly" an improper inducement), *Winder,* 362 Md. at 314, 317-18 (concluding that the following statements clearly constituted improper inducements: "I can mention to the State's Attorney, I can tell them . . . hey [appellant] will tell me everything that's going on but [appellant] wants some help too" and "I can make you a promise, okay? I can help you. . . . I could try to protect you."), *and Hillard*, 286 Md. at 153 (concluding that the following promise was improper: "I will go to bat for you to the extent that I will tell the State's Attorney's Office and the Court, number one, that you have cooperated, number two, you have told me the truth, and number three, I believe you were not knowledgeable as far as the murder was concerned"), *with Hill*, 418 Md. at 78-79 (concluding that the officer's statement that the victim's family "did not want to see him get into any trouble, but they only wanted an apology" would cause a reasonable layperson to *infer* leniency based on that statement upon his confession).

16

If the court finds that an improper inducement was made, then the court turns to the second prong, which is whether "the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement." *Lee*, 418 Md. at 161 (citing *Hillard*, 286 Md. at 153). This prong "triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession." *Winder*, 362 Md. at 311. Absent the accused's reliance on the improper remark, the statement is admissible. *Id.* at 311-12 (discussing *Reynolds v. State*, 327 Md. 494 (1992)). In order "to determine whether a suspect relied upon an offer of help from an interrogating authority in making a confession[,] we examine the particular facts and circumstances surrounding the confession." *Id.* at 312. It is the State's burden to prove, "by preponderance of the evidence, that the accused did not make the inculpatory statement in reliance on the improper inducement." *Hill,* 418 Md. at 77 (citing *Hillard*, 286 Md. at 153; *Winder*, 362 Md. at 310). "Both prongs must be satisfied before a confession is deemed to be involuntary." *Winder*, 362 Md. at 310.

In the instant case, Appellant contends that the following statements made by the detectives interviewing him were improper:

1) "'I was raped and I was forced.' Well, you're going to get in trouble for that. *If it was consensual, that's a whole different story*."

2) "And our main job isn't to put cuffs on you and throw you in jail. That's not our job."

3) "This is the opportunity for your – *if there was force, we have a problem; if there's not force, then it's consensual, and that's when she get's* [sic] *help*."

17

4) "I'm going to tell you what. If she said it was consensual and she passed that, we wouldn't come down here. It took us two hours to get down here to talk to you, to give your side of the story. It took me two hours to get down here. *If she said it was consensual and passed that polygraph, we wouldn't have come down here*."

5) "Okay. *Tell me what the consensual part of it was and we can roll out of this*."

(Emphasis added). Based on these statements, Appellant contends that "[i]t is patently obvious that the officer implied to Appellant that it would be better for him or to his advantage to confess to consensual contact with [K.N.]," and that "all that is required to make the statement involuntary" is "an implication that there would not be trouble or there would be less trouble if [he] . . . admitted to consensual contact."

Turning to the first prong of the *Hillard* common law test, we are unable to identify an express promise or offer of a benefit or leniency in exchange for Appellant's confession. Accordingly, the detectives' statements fall within the realm of implied promises. *See Winder*, 362 Md. at 311 (noting that although an appellant "need not point to an express *quid pro quo*," he must demonstrate "a promise or offer within the substance of the officer's eliciting statement" (citing *Reynolds,* 327 Md. at 507)). To the extent that a promise might be implied by the substance of the detectives' statements, we must determine whether a reasonable layperson in Appellant's position would have been moved to make an inculpatory statement upon hearing the statements. *Hill*, 418 Md. at 76.

*Hill v. State* guides our determination of whether an officer's statements to an accused impermissibly imply a promise or leniency under the first prong of the *Hillard*

18

test.  In that case, an ordained minister was accused of engaging in sexual conduct with the eight- or nine-year-old victim.  *Hill*, 418 Md. at 67.  A detective orchestrated a one-party consent phone call from the victim to the minister in an attempt to elicit an admission or apology.  *Id.* at 67-70.  Four days later, the detective called the minister, notified him that "his name came up in an investigation" and "it wasn't that big of a deal," and asked if the minister would participate in an interview.  *Id.* at 70.  The minister agreed and, during the interview at the police station, the detective disclosed that the police had recorded the telephone call and that "[the victim] and his mother did not want to see him get into trouble, but they only wanted an apology."  *Id.* at 71. The minister proceeded to admit that he "masturbated" the victim six times and wrote an apology letter.  *Id.*  At his suppression hearing, the minister testified that he wrote the apology letter because he was "a minister, and all [he] wanted to do was have this over and not be brought to shame because of a lie."  *Id.* at 72.  In addition, he believed that supplying an apology letter "would just end the nightmare and what [he] was going through."  *Id.*  The circuit court denied the minister's motion to suppress, and we affirmed.  *Id.* at 66.  The Court of Appeals granted certiorari and ultimately vacated our decision.  *Id.*

The Court held that detective's remarks—that the victim and the victim's mother "did not want to see him get into trouble, but they only wanted an apology"—constituted an improper inducement under prong one of the *Hillard* test because a reasonable layperson in the suspect's position would have taken the detective's statements to mean that "he could gain the advantage of non-prosecution or some other form of assistance, upon making an apology to the victim and his family."  *Id.* at 78-79.  The Court observed

19

that, in the context of the case, "an objectively reasonable interpretation of the word 'trouble,' is trouble with the law." *Id.* (citation omitted). Moreover, the Court concluded that a reasonable layperson in the accused's position, upon hearing the officer's statement, "would not necessarily understand that the State could prosecute him or her, even against the wishes of the victim or victim's family." *Id.*

We perceive meaningful factual distinctions between the instant case and *Hill.* First, the accused in *Hill* was not arrested prior to questioning as was Appellant. In the instant case, Appellant was arrested, read his *Miranda* rights, and then—as he was sitting, restrained in the police station—informed of the charges against him and that those charges could not be "sugarcoat[ed]" because they were "pretty bad." These facts do not necessarily figure in the analysis of whether the detectives made an explicit promise of assistance or leniency. But when, as here, we are dealing with implied assertions by the detectives and are trying to ascertain what a reasonable layperson would take those statements to mean, these facts do impact the circumstances and the determination of whether a reasonable layperson would believe he could just "roll out of [t]here" by saying that anal sex with a four-year old was consensual.

Second, in *Hill,* the accused was told during a *voluntary* interview that the victim did not want him to be in trouble so long as he apologized, and it was objectively reasonable, from the vantage point of a layperson, that if he apologized he would not be prosecuted. Here, the detectives said it was important to understand whether the sex was forced. Appellant contends that this implied some form of leniency if Appellant confessed that the sex was consensual, but the detectives also told Appellant that they

20

needed to know if the sex was forced so that the child could seek proper treatment. They never actually said he would be charged with a lesser offense if the sex was consensual, and they never offered Appellant assistance if he confessed. An "appeal to the inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense." *Williams*, slip op. at 37 (quoting *Ball v. State*, 347 Md. at 179) (internal quotation marks and citations omitted). Appellant also argues that the detectives clearly implied that he could roll out of his charges if he told them it was consensual,[10] but as the State pointed out at the hearing below, the detectives also told Appellant that they had driven two hours to get his side of the story, and they said "*we* can roll out of this," not "*you* can roll out of this." Clearly the detectives used all of their persuasive powers, even telling some untruths while toeing the improper inducement line, but in the end, they did

---

[10] In Maryland, consent may be a defense to sex offense charges involving an adult victim, and, accordingly, a reasonable layperson might confess to consensual conduct if the victim was an adult. *See* CL § 3-305(a) (defining first-degree sex offense); § 3-306(a) (defining second-degree sex offense); § 3-303(a) (defining first-degree rape); § 3-304(a) (defining second-degree rape). Even where the victim is close to majority age, we note that the "mistake-of-age" defense in the context of statutory rape is not recognized in Maryland. *See Owens v. State*, 352 Md. 663, 674 (1999) (rejecting the "mistake-of-age" defense and affirming statutory rape's characterization as a "strict liability crime"); *Garnett v. State*, 332 Md. 571, 607 (1993) (observing that "a person engaging in intercourse with a female, whom he knows to be under 14[,] may not set up her consent as a defense").

not cross it. Standing between them and the other side was the impenetrable reality that any reasonable layperson would recognize as ludicrous the chance of charges being dropped or lesser charges being filed in exchange for a confession to a patently perverse proposition—a four-year-old consenting to sexual conduct.

This Court has stated definitively that children lack the capacity to provide consent:

> [C]onsent to sexual contact with an adult cannot be given by a child as a matter of law. To be effective, consent must be given by one who has the capacity to give it. . . . *We have no trouble in holding as a matter of law that seven and nine year old children are incapable of appreciating the nature, extent and probable consequences of sexual conduct with an adult, and thus, cannot provide valid consent.* Moreover, . . . even when a person is in fact competent to give consent, a statute may prevent the consent from being effective if the statute is found to be intended to give special protection against certain kinds of harm. One example given by comment b [Restatement (Second) of Torts § 892(A), defining "effect of consent,"] is statutory rape.

*Pettit v. Erie Ins. Exch.*, 117 Md. App. 212, 224-25 (1997) (emphasis added), *aff'd*, 349 Md. 777 (1998). Even without such a decree from the legislature or judiciary, objectively reasonable people simply would not believe that a four-year-old child is capable of consenting to sexual activity. *Cf. United States v. Kise*, 369 F.3d 766, 774 (4th Cir. 2004) (noting that the defendant's honest belief that a child is capable of consenting to sexual activity is "undeniably perverse to objective individuals without his paraphilia"). It so follows that it is manifestly unreasonable for a person to believe that a four-year-old is capable of consenting to sexual intercourse and, accordingly, that confessing to "consensual" anal intercourse with a four-year-old would yield non-prosecution or leniency in prosecution.

Even if Appellant actually believed that the detectives' statements meant that by confessing to consensual sexual conduct, a lesser charge would be filed against him, we note that encouraging a suspect to adopt a version of the facts that might mitigate the punishment for the crime he committed is not in itself an improper inducement under Maryland law. *Williams*, slip op. at 43. Moreover, in the instant case, the detectives did not actually tell Appellant that a lesser charge may be filed against him by saying the sex was consensual. We are not called upon to evaluate what Appellant might have believed the detectives meant, but what a reasonable layperson would have understood the detectives' words to mean. *Lee, supra*, 418 Md. at 156. Indeed, "[a]n accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under [prong one of the *Hillard* test.]" *Hill*, 418 Md. at 76. Because no objectively reasonable layperson would rely on Detective Birch's statements as a promise of non-prosecution or a lesser charge, Detective Birch's statements did not constitute an improper inducement, and the first prong of the *Hillard* test is not satisfied. As a result, we need not evaluate the second prong.[11]

---

[11] We note that even if we were to review the second prong, our review would be limited, because Appellant did not testify at his suppression hearing, thereby leaving only the transcript and DVD of the interview for us to consider. As this Court stated in *Ashford v. State*, 147 Md. App. 1, 56, *cert. denied*, 372 Md. 430 (2002), "the failure of a defendant to testify almost forecloses any chance of prevailing" on a suppression motion based on an alleged absence of voluntariness. "Only the defendant can truly tell us what was going on in the defendant's mind. Without such testimony,

23

Finally, we add that the totality of the circumstances do not suggest involuntariness here. While Appellant was under arrest and restrained by a device attached between his leg and the floor, two detectives in plainclothes conducted the interview in an interview room at the D.C. police station. Appellant appeared calm, coherent, and awake throughout the interview, and stated that he was not on any medications at the time. Further, Appellant was studying to be a computer programmer at Strayer University, suggesting that he was of average intelligence and capable of understanding what was happening during the course of the interview. Indeed, Appellant stated that he understood his *Miranda* rights, agreed to speak with the detectives, and initialed and signed the waiver of rights form. And, our review of the transcript and the DVD recording persuades us that Appellant was not threatened or coerced into making a statement.

The suppression court properly denied the motion to suppress.

**JUDGMENTS AFFIRMED.**
**COSTS TO BE PAID BYAPPELLANT.**

---

there is usually no direct evidence of involuntariness." *Id*.

24