*Dru Darren Brown v. State of Maryland*, No. 1103, September Term, 2019.  Opinion by Woodward, J.

**CRIMINAL LAW – RAPE AND SEXUAL OFFENSES – FORCE OR THREAT OF FORCE – SUFFICIENCY OF THE EVIDENCE – PERPETRATOR'S CREATION OF FEAR OF IMMINENT BODILY HARM – VICTIM'S GENUINE AND REASONABLE FEAR OF SUCH HARM**

**CRIMINAL LAW – CONFESSIONS – MARYLAND COMMON LAW – IMPROPER PROMISES AND INDUCEMENTS**

In 2017 and 2018, appellant, Dru Darren Brown, sexually assaulted his girlfriend's teenage daughter multiple times in their home in Hagerstown, Maryland.  Appellant moved in with the victim, her mother, and her young sister in 2013.  Appellant became the father figure in the home and was responsible for disciplining the victim, who was eleven years old at the time, usually in the form of spankings or taking away toys.  In 2017, however, when the victim was almost sixteen years old, appellant's discipline turned to sexual assaults.  In 2018 while appellant and the victim's family were on vacation in Tennessee, the victim told her family that appellant had been abusing her.  Detectives in Tennessee interviewed appellant, during which appellant provided incriminating statements.

At trial, the victim described the first sexual assault.  Appellant went to the victim's bedroom, which was isolated in the attic, to discipline her for having "an attitude." Instead of spanking the victim as he had in the past, appellant asked the victim if she wanted a massage.  When she declined, appellant told her to take off her clothes.  The victim told appellant, "I can defend myself," and he immediately put his hands around her neck, shoved her to the floor, held her there for several minutes, and tried to choke her.  The victim attempted to, but couldn't, get away because appellant was twice her size.  When appellant released her, the victim complied and removed her clothes because she was "scared" of being choked.  Appellant told the victim to place a towel on the bed and lie face down.  He then massaged her, told her to flip onto her back, put his hands between her legs, and inserted his fingers into her vagina.  Using the same *modus operandi*, appellant sexually assaulted the victim once or twice a month for the next year.  Appellant did not use actual force during any of the subsequent assaults.

Appellant was charged and convicted of one count of sexual abuse of a minor and a combined thirty-one counts of sexual offense in the second degree, rape in the second degree, and sexual offense in the third degree.

**Held**: Affirmed.

On appeal, appellant argued that the evidence was insufficient to sustain his convictions for the second and subsequent assaults because the State had failed to prove

force or threat of force. He further argued that his incriminating statements to the Tennessee detectives should have been suppressed because his statements were induced by improper promises and therefore involuntary under Maryland common law.

First, the Court held that there was sufficient evidence for the jury to find the essential element of "force" or "threat of force" for all of appellant's convictions, including those that stemmed from the second and subsequent assaults. The Court reviewed and synthesized the relevant case law on threat of force in *Hazel v. State*, 221 Md. 464 (1960), *Rusk v. State*, 289 Md. 230 (1981), and *Martin v. State*, 113 Md. App. 190 (1996), and explained that "threat of force" has two elements: The evidence must support a finding that (1) the conduct and words of the perpetrator were reasonably calculated to create in the mind of the victim a real apprehension, due to fear, of imminent bodily harm, serious enough to impair the victim's will to resist; and (2) the victim's fear of imminent death or serious bodily harm must be both genuine and reasonable. The Court noted that the first sexual assault involved actual force when appellant choked the victim and pinned her to the floor. For the second and subsequent assaults, however, there was no actual force. The Court held (a) that appellant's use of the same *modus operandi* in the assaults, which triggered in the victim's mind a reminder of the actual force used by appellant and a fear of its repetition, combined with "(1) appellant's role as a father figure and disciplinarian, (2) appellant's physical size, (3) the isolated location of the attacks, (4) the lack of available assistance, and (5) the inability to escape" were calculated to create a fear of imminent bodily harm in the victim's mind; and (b) that the victim's fear was genuine and reasonable.

Next, applying Maryland common law on the question of voluntariness of appellant's incriminating statements to the Tennessee detectives, the Court held that the detectives did not make any improper promises to induce appellant's confession. Appellant pointed to the following statements by the detectives during his interview: (1) "We want to help you out," and (2) "Regardless of what you tell us you're walking out that door without us" and he was not in "trouble with" them. The Court, citing the Court of Appeals's recent opinion in *Madrid v. State*, No. 50, Sept. Term 2020 (Md. July 9, 2021), explained that under Maryland common law a confession is involuntary where it is the product of an improper promise by the police that the suspect "will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession." *See Madrid*, slip op. at 34. Because the detectives' statements about helping appellant out never expressly or impliedly offered appellant any "special consideration" in exchange for a confession, and because the detectives' statements about not arresting appellant or appellant not being in trouble with them did not promise, expressly or impliedly, that appellant would not be prosecuted in exchange for a confession, the Court held that appellant's statements were voluntary under Maryland common law.

Circuit Court for Washington County
Case Nos. C-21-CR-18-467, C-21-CR-18-765

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1103

September Term, 2019

_____

DRU DARREN BROWN

v.

STATE OF MARYLAND

_____

Graeff,
Berger,
Woodward, Patrick L.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Woodward, J.

_____

Filed: September 2, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

From early 2017 until May 2018, Dru Darren Brown, appellant, sexually assaulted his girlfriend's teenage daughter, B.H., on numerous occasions at their home in Hagerstown, Maryland. On May 2, 2019, appellant was convicted in the Circuit Court for Washington County of one count of sexual abuse of a minor and multiple counts of sexual offense in the second degree, rape in the second degree, and sexual offense in the third degree. The court sentenced appellant to twenty-five years of incarceration on the sexual abuse of a minor conviction, followed by consecutive sentences of a total of twenty years suspended, with five years of supervised probation.

On appeal, appellant raises two questions for our review:

1. Is the evidence sufficient to sustain the convictions?
2. Did the trial court err in denying the motion to suppress [a]ppellant's statements?

For the reasons set forth herein, we shall affirm.

## BACKGROUND

B.H. was born on May 3, 2001. In February of 2013, when B.H. was eleven years old, she was living with her mother, Jennifer, and her younger sister, M.T., in Hagerstown, Maryland. At that time, Jennifer was going through a difficult divorce with M.T.'s father and had just moved with B.H. and M.T. from an abused women's shelter to a new home. Appellant, who was then living with his wife, Melonie, in Wisconsin, had been engaged in a three-year online relationship with Jennifer through a computer game called Ebony. Because of Jennifer's "rough divorce" and difficulty in handling her two daughters, appellant moved to Maryland in February of 2013 and moved in with Jennifer, B.H., and M.T. Appellant's and Jennifer's relationship blossomed, and she gave birth to a son, A.B.,

in January of 2014.  In February of 2014, however, appellant convinced Jennifer to allow Melonie to move in with them.  Within one year after Melonie moved in, appellant, Melonie, and Jennifer began sharing the same bedroom, and that arrangement continued through May of 2018.

When appellant moved in with Jennifer, B.H., and M.T. in 2013, he became the person who primarily disciplined B.H. At the beginning, appellant's discipline took the form of spankings, taking away toys, and lectures about B.H.'s behavior.  In 2017, however, when B.H. was fifteen years old, almost sixteen years old, the discipline changed to sexual assaults.  The assaults took place once or twice a month until May of 2018 when B.H. turned seventeen years old.

In May 2018, appellant, Jennifer, Melonie, B.H., M.T., and A.B. attended a Pagan Unity Festival in Tennessee.  While on the trip, B.H. told her mother that appellant had been "touching [her] inappropriately," but her mother did not take B.H.'s revelations seriously.  On May 21, 2018, Jennifer was helping B.H. get dressed and made a comment about how she did not want to touch B.H. inappropriately, a perceived jab based on B.H.'s claim.  B.H. became upset and, while the rest of the family was out eating breakfast, B.H. locked herself in their hotel room, called her grandmother, and told her grandmother everything that appellant had done.  B.H.'s grandmother called the police.

The same day, May 21, 2018, Detectives Jacob Masteller and Megan Hoffman of the Metro Nashville Police Department were dispatched to B.H.'s hotel in Brentwood, Tennessee on a report that "a teenage girl had disclosed sexual abuse by her mother's boyfriend."  Upon arrival, the detectives found appellant waiting in the lobby.  After

introductions, the detectives and appellant went to the breakfast area of the hotel where the detectives conducted a recorded interview that lasted about two and one-half hours. After the interview, the detectives left the hotel without arresting appellant. The detectives then called their District Attorney and another detective, the latter being in contact with the Hagerstown police, and were advised to place appellant under arrest on a fugitive from justice warrant.[1] Approximately thirty minutes after the interview appellant was taken into custody.

Appellant was charged in the Circuit Court for Washington County with one count of sexual abuse of a minor and a total of thirty-one counts of sexual offense in the second degree, rape in the second degree, and sexual offense in the third degree. A jury trial was held on May 1 and 2, 2019.

At trial, B.H. testified about the sexual assaults that appellant committed on her.[2] She explained that appellant was the "father figure of the house" and the primary

---

[1] Actually, a fugitive from justice warrant had not yet been issued when Detectives Masteller and Hoffman were directed to arrest appellant. When the information gathered from appellant's interview was conveyed to the Hagerstown police, the Hagerstown police advised that they planned to obtain a felony warrant for appellant's arrest. After speaking to the District Attorney in Nashville's Child Sex Crimes Unit, Detective Masteller was advised to place appellant under arrest on the pending fugitive from justice warrant for the victim's protection. The District Attorney was able to authorize the arrest before the warrant was issued because of the nature of the crime and the involvement of another jurisdiction.

[2] Because the sole issue raised by appellant in this appeal regarding the trial is the sufficiency of the evidence to convict appellant, we view the trial evidence in a light most favorable to the State. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Albrecht*, 336 Md. 475, 478 (1994). The evidence adduced at the suppression hearing will be discussed *infra*.

disciplinarian of all the children. When she was younger, appellant treated B.H. "like all the other kids," disciplining them through spankings or losing their toys. Appellant's discipline of B.H., however, changed to sexual assaults in 2017 when B.H. was fifteen years old, almost sixteen years old.

The circumstances surrounding the first sexual assault began when appellant went to B.H.'s bedroom to discipline her for having "an attitude." B.H.'s bedroom was located in the attic of the house and was the only room in the attic. Instead of spanking her as he had in the past, appellant asked B.H.: "Do you want a massage?" B.H. said that she did not, and appellant told her to take her clothes off. B.H. responded: "I can defend myself if I really need to," which prompted appellant to immediately "put his hands around [her] neck and shove[] [her] to the floor and h[o]ld [her] there for a few minutes." Appellant also "tried to choke [B.H.] out on the floor." B.H. struggled and tried to get away, but she was only 5'1," 130 pounds, at the time and appellant was "[a]bout a foot taller" and "double if not more" her weight. B.H. then complied with appellant's demand and took her clothes off; she did so "[b]ecause [she] was scared" of appellant "choking [her]" and because she did not want "his nasty hands touching [her] more than they needed to." Appellant told B.H. to lay a towel on the bed and lie down on her stomach, which she did. Appellant massaged B.H.'s back with "massaging oil," including touching "[a]ny part you can touch" of B.H.'s "butt." Appellant then told B.H. to turn over on her back, which she did because she "was scared." Appellant proceeded to put his hands between B.H.'s legs and insert "two to four fingers" into her vagina. Appellant "finger[ed]" B.H. for "about twenty minutes" that first time.

B.H. testified that the first assault was not an isolated occurrence. She explained that appellant continued to assault her and that the later assaults "always started the same way." Appellant would go to B.H.'s bedroom in the attic "always in the context of discipline." B.H. recalled that she would be punished for "the littlest things sometimes." If anyone else was in B.H.'s bedroom, appellant would order that person to leave.[3] Appellant would instruct B.H. to lay a towel down on the bed, remove her clothes, and lie down on her stomach. B.H. testified that she complied with appellant's requests "[b]ecause every time, [she] was scared." Appellant "would do his massage and then he would ask [her] to flip over." Initially, appellant only inserted his fingers into her vagina, but things later "escalated," and appellant would insert his fingers into her vagina, perform oral sex on her, and insert his tongue into her vagina. He also would place his mouth on her breasts. The assaults stretched for longer periods of time after the first instance. B.H. recalled being touched in the manner described above about fifteen to eighteen times, once or twice a month, the last time being "a week or two before the festival" in May 2018.

B.H. admitted that after the first assault, appellant never choked her or physically held her down. B.H. said that she did not scream or shout for help because she was "afraid" and she allowed appellant "to do those things" "[b]ecause just looking at him remind[ed] [her] of how nasty he is and how forceful he is." B.H. explained further that she couldn't do anything about appellant's abuse, because "I knew if I told my mom, she wasn't going

---

[3] B.H's younger sister, M.T., shared the attic bedroom with B.H. for B.H.'s "whole 15th year and most of her 16th year."

to believe me." According to B.H., her mother "always took [appellant's] side of the story" during arguments. During one of his assaults, appellant told B.H. that her mother was "not gonna do anything" about the attacks because she would "believe his words over [B.H.'s]," as B.H. was "just a rowdy teenager." When asked why she didn't try to fight against appellant, B.H. recalled telling appellant during the fourth or fifth assault that she had a work knife nearby. Appellant "convinced" her, however, that "it was [] illegal" for her to use the knife "even if it was for defense," and told her that, if she used the knife against him, she would "go to jail for it." Appellant also said that no one would believe her "because he was the adult and [she] wasn't." Finally, B.H. said that she never ran out of her bedroom during appellant's assaults because she didn't want to cause a scene in front of her mother and her mother "wouldn't believe [her] anyways."

On May 2, 2019, appellant was convicted of all charges, to wit, one count of sexual abuse of a minor, five counts of sexual offense in the second degree, six counts of rape in the second degree, and twenty counts of sexual offense in the third degree. On August 14, 2019, the circuit court sentenced appellant to twenty-five years' incarceration for sexual abuse of a minor, followed by consecutive, suspended sentences of twenty years for second degree sexual offense, twenty years for second degree rape, five years for second degree sexual offense, five years for third degree sexual offense, and five years for third degree sexual offense, all concurrent with each other, giving appellant a total of twenty years suspended and consecutive to the twenty-five years of incarceration for sexual abuse of a minor. The court also imposed five years of supervised probation. All remaining convictions were merged for sentencing purposes.

Appellant filed this timely appeal. We shall supply additional facts as necessary below.

## DISCUSSION

### I. Sufficiency of the Evidence

#### A. Standard of Review

When an appellate court reviews for sufficiency of the evidence, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Scriber v. State*, 236 Md. App. 332, 344 (2018) (emphasis in original) (quoting *Darling v. State*, 232 Md. App. 430, 465 (2017)). "It is not our role to retry the case." *Smith v. State*, 415 Md. 174, 185 (2010). "The jury as fact-finder 'possesses the ability to choose among differing inferences that might possibly be made from a factual situation'" and the appellate court "'must give deference to all reasonable inferences [that] the fact finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Bible v. State*, 411 Md. 138, 156 (2009) (alteration in original) (quoting *State v. Suddith*, 379 Md. 425, 430 (2004)). We provide this deference because the jury had the opportunity to "'weigh[] the credibility of witnesses and resolv[e] conflicts in the evidence,'" whereas we do not. *Scriber*, 236 Md. App. at 344 (quoting *Darling*, 232 Md. App. at 465).

#### B. Contentions of the Parties

Appellant argues that the evidence was insufficient to sustain his convictions because force is an essential element of each of the charged offenses and "the State failed

to prove force or the threat of force." Appellant concedes that the evidence was sufficient to support a finding that the sexual acts "occurred," but he argues that "[w]ithout any evidence of force or threat of force, the conviction[s] and resulting sentences cannot stand." Specifically, appellant points to the lack of any actual force or threat of force in the second and subsequent sexual assaults and asserts that the actual force used by appellant in the first assault was "insufficient to create an objectively reasonable fear of force for multiple alleged instances of sexual activities over the course of a year."

The State responds that the evidence was sufficient to show that "B.H. reasonably feared serious bodily harm" during the subsequent instances of assault, under the totality of the circumstances. Because appellant used actual force during the first assault, the State argues that appellant's "conduct, namely choking B.H. into sexual submission, communicated that resistance would be met with extreme violence." The State further points to appellant's position as the authority figure in the family, the similarity of the instances of sexual assault, and B.H.'s belief that her mother would not believe her if she complained about the assaults. As a result, the State concludes that B.H. developed a sense of helplessness and fear that extended to the later attacks.

### C. Force or Threat of Force

The crimes for which appellant was convicted occurred from May 3, 2017 to May 3, 2018. Appellant was convicted of five counts of sexual offense in the second degree, which took place during the period of May 3, 2017 to September 30, 2017. Prior to October 1, 2017, Maryland Code, § 3-306 of the Criminal Law Article ("CR") prohibited sexual offense in the second degree by providing that "(a) A person may not engage in a sexual

act with another: (1) *by force, or the threat of force*, without the consent of the other."

(emphasis added). A "sexual act" was defined in relevant part then, as it is now, as:

> [A]ny of the following acts, regardless of whether semen is emitted:
>
> ***
>
> (ii) **cunnilingus**
>
> ***
>
> (v) **an act:**
>
>> **1. in which an object or part of an individual's body penetrates, however slightly, into another individual's genital opening or anus**; and
>>
>> 2. that can reasonably be construed to be for the sexual arousal or gratification, or for the abuse of either party.
>
> (2) "Sexual act" does not include:
>
>> (i) vaginal intercourse[.]

CR § 3-301(d) (emphasis added).

Effective October 1, 2017, the General Assembly repealed sexual offense in the second degree as set forth in CR § 3-306. Instead of replacing CR § 3-306, the General Assembly amended CR § 3-304, the statute prohibiting rape in the second degree, to provide in pertinent part:

> (a) **A person may not engage in** vaginal intercourse or **a sexual act with another**:
>
>> (1) **by force, or the threat of force**, without the consent of the other[.]

CR § 3-304(a)(1) (emphasis added). Appellant was convicted of six counts of second degree rape committed from October 1, 2017 to May 3, 2018.

Appellant also was convicted of twenty counts of sexual offense in the third degree

committed from May 3, 2017 to May 3, 2018. Sexual offense in the third degree states:

> (a) A person may not:
>
>> (1)(i) engage in sexual contact with another without the consent of the other; and
>>
>> (ii)
>>
>>> 1. employ or display a dangerous weapon, or a physical object that the victim reasonably believes is a dangerous weapon;
>>>
>>> 2. suffocate, strangle, disfigure, or inflict serious physical injury on the victim or another in the course of committing the crime;
>>>
>>> 3. **threaten, or place the victim in fear, that the victim**, or an individual known to the victim, **imminently will be subject to** death, suffocation, **strangulation**, disfigurement, **serious physical injury**, or kidnapping; or
>>>
>>> 4. commit the crime while aided and abetted by another.

CR § 3-307(a) (emphasis added). "Sexual contact" is defined as "an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification, or for the abuse of either party." CR § 3-301(e)(1).

Finally, appellant was convicted of one count of sexual abuse of a minor. CR § 3-602(b) provides:

> (1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor.
>
> (2) A household member or family member may not cause sexual abuse to a minor.

"Sexual abuse" is defined as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not," including "rape" and "sexual offense

in any degree." CR § 3-602(a)(4)(i), (ii).

In the instant case, the parties agree that each of appellant's convictions requires sufficient evidence that appellant used actual force or threat of force. Further, the element of force or threat of force is the sole ground upon which appellant challenges the sufficiency of the evidence. We must determine, then, whether any rational trier of fact could have found that appellant used actual force or threat of force in committing the sexual assaults on B.H. that are the basis of his convictions. *See Scriber*, 236 Md. App. at 344.

### D. Maryland Case Law

The concept of "force" as an essential element of crimes involving sexual assault has its genesis in *Hazel v. State*, 221 Md. 464 (1960). There, the Court of Appeals decided the issue of whether the evidence of force was sufficient to support the appellant's rape conviction. In *Hazel,* the victim was unloading groceries into her house when she "felt an arm around her neck" and was told that she was being robbed. *Id.* at 466. The appellant told the victim that he had a gun, although the victim could not see it, and threatened that if she moved, he would shoot her baby. *Id.* at 466–67. The appellant then stole money and jewelry from the victim and walked through her house looking for more to steal. *Id.* at 467. He eventually brought the victim into the kitchen, where he tied her hands behind her and gagged her with a towel. *Id.* The appellant forced the victim into the cellar and there made "obscene remarks" and "improper advances." *Id.* When the victim gasped "no," the appellant pulled the gag tight around her throat and almost strangled her. *Id.* Upon the victim's protest, the appellant loosened the gag and took her into a dark room in the cellar. *Id.* There, he told the victim to lie down on the floor and raise her legs, and then he

proceeded to have intercourse with her. *Id.* The victim did not struggle because she "was afraid for [her] life." *Id.* Later, the appellant forced the victim to go into the living room where he required her to have intercourse again. *Id.* at 468.

The Court of Appeals noted that the statute criminalizing rape at the time did not define the crime, but at common law rape was defined as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without consent and against the will of the victim." *Hazel*, 221 Md. at 468–69. The Court, noting that force was an essential element of the common law crime of rape, defined it as follows:

> Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety.

*Id.* at 469. The Court clarified, however, that "no particular amount of force, either actual or constructive, is required to constitute rape" and the determination "must depend on the prevailing circumstances." *Id.* The Court further explained the concept of *constructive* force:

> [F]orce may exist without violence. **If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim**—having regard to the circumstances in which she was placed—**a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force**.

*Id.* (emphasis added).

The Court determined that there was sufficient evidence of force to sustain the appellant's conviction. *Hazel*, 221 Md. at 470. The Court pointed to the trial court's

opinion wherein the court found that, because of the acts of violence to the victim and the threats of serious harm to her children and herself, "there existed a genuine and continuing fear of such harm on the part of the [victim]." *Id.*

The Court of Appeals next addressed the element of force in the 1981 case of *Rusk v. State*, 289 Md. 230 (1981). In *Rusk*, the defendant was convicted of second degree rape, but this Court reversed the conviction on sufficiency grounds. 289 Md. at 232. The Court of Appeals granted *certiorari* to consider whether we had "properly applied the principles of *Hazel* in determining that insufficient evidence had been produced to support Rusk's conviction." *Id.* At the time, the crime of second degree rape was defined by statute as follows:

> A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person:
>
> (1) **By force or threat of force** against the will and without the consent of the other person . . . .

*Id.* (emphasis added) (quoting Md. Code (1957, 1976 Repl. Vol., 1980 Supp.), Art. 27. § 463(a)(1)).

In *Rusk*, the victim had attended an alumnae meeting at her high school, after which she and a friend decided to get a drink in Fells Point. *Id.* at 232. The pair visited three bars, at the last of which they met the appellant. *Id.* The appellant and the victim's friend greeted each other by name. *Id.* at 232–33. After chatting with the appellant for a while, the victim told him that she needed to head home. *Id.* at 233. The appellant asked the victim for a ride to his apartment, and she agreed. *Id.* The victim, however, cautioned the appellant that nothing was going to happen between them and that she just was giving him

a ride, to which the appellant said, "Oh, okay." *Id.*

When the two arrived at the appellant's apartment, the appellant repeatedly asked the victim to come in, which she declined. *Rusk*, 289 Md. at 233. The appellant then reached over and turned off the ignition to her car and took the victim's car keys. *Id.* The appellant got out of the car, and opened the victim's door saying, "Now, will you come up?" *Id.* The victim testified that she did not know what to do, was unfamiliar with the area, and feared that the appellant might rape her. *Id.* at 233–34. The victim followed the appellant into the building and up two flights of stairs to his apartment. *Id.* at 234. The appellant told her to sit down and she sat in a chair beside the bed. *Id.* The victim again asked if she could leave, and the appellant, still in possession of her car keys, told her that he wanted her to stay. *Id.* He then asked her to join him on the bed, pulling her by the arms toward him and partially undressing her. The victim removed the rest of her clothes and the appellant's pants because "he asked [her] to do it." *Id.*

The victim "beg[ged]" the appellant to let her leave, but he continued to say no. *Rusk*, 289 Md. at 234. The victim testified that she was "really scared" of the "look in his eyes," and feared that he would kill her if she did not submit. *Id.* at 234–35. She began to cry, and the appellant put his hands on her throat and started to "lightly" choke her. *Id.* at 235. She asked the appellant whether he would let her go without killing her if she did what he wanted, and he said, "yes." *Id.* She then did "what he wanted [her] to," including intercourse. *Id.* After the assault, the victim again asked if she could leave, and the appellant said, "Yes." *Id.* The victim then got dressed, obtained her keys from the appellant, and walked out to her car, accompanied by the appellant. She asked the appellant

for directions, left, and reported the assault to the police that night. *Id.*

The Court of Appeals explained that *Hazel* made clear that the victim's fear had to be genuine but had not resolved whether a victim's fear needed to be "reasonable." *Rusk*, 289 Md. at 243. The Court noted that *Hazel* focused on the "calculations of the accused, not [] the fear of the victim." *Id.* The Court, looking to other jurisdictions for guidance, adopted for the first time in Maryland the majority rule that "the victim's fear [must] be *reasonably grounded* in order to obviate the need for either proof of actual force on the part of the assailant or physical resistance on the part of the victim." *Id.* at 244 (emphasis added).

Applying the principles of *Hazel*, as modified above, the Court determined that "the trier of fact could rationally find that the elements of force and non-consent had been established and that [the appellant] was guilty of the offense beyond a reasonable doubt." *Id.* at 245. Among others, the Court highlighted the possible factual conclusions that a rational jury could draw: (1) the taking of the victim's car keys, late at night, in an unfamiliar neighborhood was intended by the appellant to immobilize her; (2) the appellant commanded the victim to enter his apartment after she repeatedly refused; (3) the victim was badly frightened and feared that the appellant intended to rape her; (4) once inside his apartment, the appellant refused the victim's request to leave; (5) the appellant pulled the victim into the bed, undressed her, and when she began to cry, "lightly" choked her; and (6) the victim finally submitted when the appellant agreed to let her go without killing her if she complied with his demands. *Id.* at 246. The Court concluded with the following observation:

Just where persuasion ends and force begins in cases like the present is essentially a factual issue, to be resolved in light of the controlling legal precepts. That threats of force need not be made in any particular manner in order to put a person in fear of bodily harm is well established. **Indeed, conduct, rather than words, may convey the threat**.

*Id.* (emphasis added) (citations omitted).

Over fifteen years after *Rusk*, the Court of Special Appeals made the next significant contribution to our understanding of force in sexual assault cases. In *Martin v. State*, 113 Md. App. 190 (1996), the victim attended a concert at Merriweather Post Pavilion in Columbia, where she consumed "large quantities of alcohol and inhaled nitrous oxide," an intoxicating substance. *Id.* at 197. She became sick and vomited for a significant period of time in the restroom. *Id.* When she left the restroom, she found that the male friend with whom she had attended the concert had disappeared. *Id.* She rested a bit and then wandered away from the concert through a wooded area, unsure of where she was going. *Id.* She eventually made her way onto the median strip of Little Patuxent Parkway and began walking generally toward her home in Montgomery County. *Id.*

The appellant was a sergeant with the Howard County Police Department. *Martin*, 113 Md. App. at 197. At about 2:30 a.m., the appellant discovered the victim on Little Patuxent Parkway appearing to be intoxicated. *Id.* The appellant offered her a ride home, and she "gladly" accepted. *Id.* In the victim's view, the appellant was "polite and friendly." *Id.* at 198.

The victim got into the front passenger seat of the police car and soon fell asleep. *Id.* at 197–98. She awoke when the car came to a stop; she was in an unfamiliar "dark

area," and did not see any people around the car. *Id.* at 198. The appellant suddenly began to touch her legs and comment about her body. *Id.* The victim pretended to be asleep, hoping that the appellant would stop. *Id.* He did not stop; the appellant began to fondle the victim's vagina and penetrate her with his fingers. *Id.* The victim testified that she did not resist "because she believed that the appellant would hurt her, or even kill her, to prevent her from reporting what was taking place." *Id.* She also said that the appellant was "bigger" than she was and as a police officer, he was armed with a handgun. *Id.* Eventually, the appellant inserted a mini-flashlight into the victim's vagina, repeated the act, and fondled other parts of her body, including her breasts. *Id.* at 199. The victim continued to pretend to be asleep throughout the assault and did not consider running because she feared that the appellant might shoot her. *Id.* The appellant finally stopped and took the victim to her home. *Id.*

The appellant was convicted of second degree sexual offense, third degree sexual offense, fourth degree sexual offense, and battery. *Martin*, 113 Md. App. at 237. On appeal, the appellant challenged his conviction for second degree sexual offense only on the ground that there was insufficient evidence of the required element of "force or threat of force." *Id.* The State and the appellant agreed that "there was no *actual* force used in committing these sexual acts and that [the victim] offered no actual physical resistance to the appellant's sexual actions." *Id.* at 244 (emphasis in original). The only question for this Court to decide was whether the evidence supported a finding of threat of force. *Id.*

This Court first addressed *Hazel*'s requirement that "'the acts and threats of the defendant were reasonably calculated to create in the mind of the victim . . . a real

apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist.'" *Id.* at 245 (quoting *Hazel*, 221 Md. at 469). We observed that "the conduct need not always be so blatantly 'forceful.' Rather, the perpetrator's creation of certain conditions may, depending on the circumstances, obviate the need for such outward expressions of force." *Id.* at 246. Looking at the facts in *Martin*, this Court noted that, "[a]lthough there were no overt verbal or physical threats made in this case (after all, the victim appeared to be asleep), there were other circumstances created by the appellant that had the potential to be very intimidating." *Id.* at 249. Specifically, "the appellant knew that his status as a police officer, the secluded location to which he drove, and the nature of the sexual acts he performed, his physical appearance, and her questionable sobriety would have the effect of eliminating any resistance to his efforts by [the victim]." *Id.* at 250. Therefore, we concluded that there was sufficient evidence to show that appellant reasonably intended to create circumstances that produced in the victim a real apprehension, due to fear, of serious bodily harm if she resisted. *Id.*

Regarding the second element of threat of force, articulated in *Rusk*, this Court concluded that the circumstances created by the appellant caused the victim to have "a *reasonable* fear of death or serious bodily harm." *Martin*, 113 Md. App. at 250 (emphasis added). We pointed out that the appellant's "status as a uniformed and armed police officer was a very important factor that weighs heavily in favor of finding that [the victim]'s fear was reasonably grounded." *Id.* at 249. We further noted that the victim awoke in an unfamiliar and isolated "dark area" where an armed police officer, who was "much bigger" than her, began to engage in "extreme" sexual conduct without her permission, and there

were no people available to help her, nor any place for her to escape. *Id.* The victim was also still feeling the effects of her consumption of alcohol to some degree. *Id.* Therefore, this Court held that "[t]he creation of that set of circumstances constituted constructive force and rendered the appellant guilty of a sexual offense in the second degree." *Id.* at 250.

### E. Synthesis of Maryland Case Law

A synthesis of the aforementioned case law shows that "threat of force" has two required elements. First, with the focus on the perpetrator, the evidence must demonstrate that the conduct and words of the perpetrator "were reasonably calculated to create in the mind of the victim . . . a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome [the victim's] will to resist." *Hazel*, 221 Md. at 469. Second, with the focus on the victim, the evidence must support a finding that the victim's fear of imminent death or serious bodily harm must be both genuine and reasonable. *Rusk*, 289 Md. at 243–44.

The Court of Appeals and this Court have emphasized that "threats of force need not be made in any particular manner" and that "conduct, rather than words, may convey the threat." *Id.* at 246; *see Martin*, 113 Md. App. at 246, 249. When the threats of force have been conveyed by conduct alone, this Court has looked for "circumstances created by the appellant that ha[ve] the potential to be very intimidating." *Martin*, 113 Md. App. at 249. Such circumstances include, but are not limited to, the following: (1) the status of the perpetrator as a figure of authority, (2) the physical appearance of the perpetrator, (3) the isolated or secluded nature of the location of the sexual assault, (4) the familiarity of the

victim with such location, (5) the availability of assistance, (6) the opportunity to escape, (7) the time of day or night, (8) the nature of the sexual acts performed, and (9) the sobriety of the victim. *See Martin*, 113 Md. App. at 249–50; *see also Walter v. State*, 9 Md. App. 385, 392 (1970) (stating that "there is some analogy between the cases involving parents and those involving policemen since both the parent and the policeman are figures of authority"). The aforementioned circumstances, taken from the view of the victim, are considered by a court to determine whether a rational jury could find that the victim's subjective perception of a threat of force is "reasonably grounded." *Rusk*, 289 Md. at 244; *see Martin*, 113 Md. App. at 245–46. Once sufficient evidence of both required elements of "threat of force" is adduced from "the myriad of circumstances that can arise," the issue of "threat of force" becomes a factual one, to be resolved by the trier of fact. *Martin*, 113 Md. App. at 247; *see Rusk*, 289 Md. at 246; *Hazel*, 221 Md. at 470.

## F. Analysis

### 1. First Sexual Assault

The first sexual assault on B.H. undoubtedly involved appellant's use of actual force to overcome B.H.'s resistance to his demands. When B.H. declined appellant's offer of a massage and told appellant that she could "defend" herself in response to his demand to take her clothes off, appellant physically assaulted her by putting his hands around her neck, shoving her to the floor, holding her on the floor for a "few minutes," and trying to choke her. B.H. then complied with appellant's demand to take her clothes off. B.H. also complied with appellant's instruction to lay a towel on the bed, to lie down on her stomach, and after appellant's "massage" of her back and buttocks, to turn over on her back. B.H.

stated that she complied with appellant's demand that she take her clothes off because she was afraid of appellant "choking" her and because she did not want his "nasty hands touching" her. B.H. also testified that she complied with appellant's other demands because she was "scared."

Similarly, in *Hazel*, when the victim said "no" to the appellant's advances, he pulled the gag tight around her throat, almost strangling her. 221 Md. at 467. Thereafter, the victim complied with the appellant's demands to lie down on the floor in the cellar and raise her legs, and later to have intercourse with him in the living room. *Id.* at 467–68. In *Rusk*, the appellant refused the victim's repeated requests to leave his apartment, and when she started to cry, he put his hands on her throat and started to "lightly" choke her. 289 Md. at 234–35. After seeking and receiving assurances from the appellant that he would let her go without killing her if she did what he wanted, the victim did "what he wanted [her] to," including intercourse. *Id.* at 235. Therefore, this Court concludes that for appellant's first sexual assault on B.H., there was sufficient evidence for a jury to conclude that the essential element of force was satisfied.

### 2. *Second and Subsequent Sexual Assaults*

It is undisputed that at no time during the second and subsequent sexual assaults did appellant employ actual force to overcome any resistance by B.H. Thus our task is to determine whether there was sufficient evidence of "threat of force" to support appellant's convictions for the second and subsequent sexual assaults on B.H. Specifically, we must decide whether a rational jury could find that appellant's conduct and words were reasonably calculated to create in B.H.'s mind a fear of imminent bodily harm serious

enough to overcome her will to resist and that B.H. had a genuine and reasonable fear of imminent death or serious bodily harm if she resisted.

The crux of appellant's argument is that appellant's use of actual force in the first sexual assault was "insufficient to create an objectively reasonable fear of force for multiple alleged instances of sexual activities over the course of a year." Because appellant's use of actual force in the first sexual assault was not repeated, appellant contends that "there was simply nothing to support an objectively reasonable fear on the part of B.H." Appellant is mistaken, because he overlooks the totality of the circumstances that must be considered in determining whether appellant's use of actual force in the first sexual assault conveyed a threat of force for the second and subsequent sexual assaults. *See Martin*, 113 Md. App. at 249.

Here, appellant employed the same *modus operandi* in the second and subsequent sexual assaults as he did in the first one. Appellant committed each assault on B.H. after the first one at the same location, in a similar manner, and with almost identical sex acts. Indeed, the assaults took on an almost ritualistic character. Appellant went to B.H.'s bedroom in the attic once or twice a month "always in the context of discipline." B.H. testified that she would be punished for "the littlest things sometimes." If anyone else was in B.H.'s bedroom, appellant would order that person to leave. The assaults "always started the same way." Appellant would instruct B.H. to lay a towel down on the bed, remove her clothes, and lie down on her stomach. After appellant massaged B.H.'s back and buttocks, he would tell her to flip over. Appellant then would fondle B.H., sometimes perform oral sex, and penetrate her digitally or with his tongue. He also would place his mouth on

B.H.'s breasts. B.H. testified that she allowed appellant "to do those things" "[b]ecause *just looking at him remind[ed] [her] of how nasty he is and how forceful he is*." (emphasis added). In sum, by committing the second and subsequent assaults in almost the exact same manner as the first assault, appellant triggered in B.H. a reminder of the actual force employed by appellant when she refused his advances and a fear of its repetition if she were to resist.

Other circumstances identified in the case law as supporting a jury's finding of threat of force are present here regarding appellant's conduct. First, appellant used his role as "father figure of the house" and primary disciplinarian of the children to facilitate the commission of the sexual assaults on B.H. Appellant always initiated the assaults in the context of discipline. As many attackers do, appellant exploited his position as an authority figure in a parental role to victimize B.H. *See Walter*, 9 Md. App. at 392 (stating that "there is some analogy between the cases involving parents and those involving policemen since both the parent and the policemen are figures of authority"); *Martin*, 113 Md. App. at 248 (citing to the trial court's finding that the offending officer "was in position of total domination and control over the victim" (emphasis omitted)).

Second, appellant's physical size was much greater than that of B.H. As indicated above, B.H. was only 5'1" and 130 pounds while appellant was about a foot taller and double, or more, her weight. Third, the location of the sexual assault was isolated from the rest of the house and from the rest of the family in the house. B.H.'s bedroom was the only room in the attic of the family's house, and appellant would order anyone else in B.H.'s room to leave. Fourth, there was no assistance available to B.H. B.H. stated that she did

not see the point in telling her mother because "I knew if I told my mom, she wasn't going to believe me." Last, B.H. had no opportunity to escape. Because the sexual assaults took place in her own home where she believed no adult would provide assistance, B.H. essentially had no place to go if she escaped from her bedroom during one of appellant's attacks.

Finally, in addition to conduct, the words of a perpetrator are considered in determining whether a jury could find a threat of force. *See Hazel*, 221 Md. at 470 (stating that "because of [the] acts of violence . . . and the threats of serious harm to her children and herself," the factfinder found "that there existed a genuine and continuing fear of such harm"). In the instant case, during one of the assaults, appellant told B.H. that her mother was "not gonna do anything" about the assaults because she would "believe his words over [B.H.'s]," and B.H. was "just a rowdy teenager." In addition, during another attack, when B.H. told appellant that she had her work knife nearby, appellant convinced her that it was illegal for her to use a knife even in self defense, and if she tried, she would go to jail. These statements by appellant were calculated to instill in B.H. a genuine fear of serious bodily harm sufficient to overcome her will to resist, because B.H. was told that neither her mother nor the legal system would help her if she reported appellant's sexual assaults.

In sum, this Court holds that a rational jury could find that the essential element of "threat of force" has been satisfied for all of appellant's convictions. For the first sexual assault, appellant employed actual force—violently shoving B.H. to the floor, holding her on the floor for several minutes, and trying to choke her—to overcome B.H.'s resistance to his demands. For the second and subsequent assaults, appellant's use of the same *modus*

*operandi* as the first assault, which triggered in B.H.'s mind a reminder of the actual force used by appellant and a fear of its repetition, along with (1) appellant's role as a father figure and disciplinarian, (2) appellant's physical size, (3) the isolated location of the attacks, (4) the lack of available assistance, and (5) the inability to escape, were calculated to create in B.H.'s mind a real fear of imminent bodily harm serious enough to overcome her will to resist, and under these circumstances, B.H.'s fear of such harm was genuine and reasonable.

## II. Motion to Suppress

### A. The Suppression Hearing

On April 30, 2019, the circuit court held a hearing to resolve pending motions, including a defense motion to suppress appellant's recorded interview with Detectives Masteller and Hoffman of the Metro Nashville Police Department. At the beginning of the hearing, defense counsel argued, among other things,[4] that appellant's incriminating statements during the interview could not be admitted into evidence because such

---

[4] Appellant also argued that the audio recording of appellant's interview should be excluded from evidence because the recording was taken in violation of the Maryland Wiretap and Electronic Surveillance Act. *See* 18 U.S.C.A. §§ 2701–2713; Md. Code, §§ 10-401–414 of the Courts and Judicial Proceedings Article. The trial court agreed, holding that, because the Nashville detectives were not working with the Hagerstown police and the exception to the requirement of two-party consent under the statute applied only to an out of state police officer working with or under the direction of a Maryland investigative or law enforcement officer, appellant's recorded interview was taken in violation of the Maryland wiretap statute. Although the recorded interview was suppressed, Detective Masteller was permitted to testify at trial about appellant's incriminating statements in the interview, because, as we shall discuss *infra*, the trial court held that those statements were voluntary under Maryland common law, the Due Process Clause of the Fourteenth Amendment, and Article 22 of the Declaration of Rights.

statements were involuntary under the common law of Maryland, the Due Process Clause of the Fourteenth Amendment, and Article 22 of the Declaration of Rights. Both Detective Masteller and appellant testified at the suppression hearing. Also, the recorded interview of appellant and transcript thereof were admitted into evidence.

Detective Masteller testified that on May 21, 2018,[5] he and Detective Hoffman were dispatched to a hotel in Brentwood, Tennessee on a report of sexual abuse of a teenage girl by her mother's boyfriend. When the detectives arrived, they found appellant waiting for them in the lobby. The detectives explained to appellant that they were police officers, they did not intend to arrest appellant, they did not have a warrant, appellant did not have to talk to them, and if appellant started talking, he could stop. The detectives were in plain clothes and did not have their guns or badges visible.

The detectives spoke to appellant in the breakfast area of the hotel, where other people, including the wait staff, were coming and going. The detectives sat at a table across from appellant. Detective Masteller stated that he "had zero intention of making an arrest at all," and that appellant was not in custody. Because appellant was not in custody, the detectives did not give him his *Miranda* warnings. Although the detectives told appellant repeatedly that he did not need to speak to them, appellant was eager to speak to the detectives and was cooperative, referring to the interview as his "15 minutes of fame." Indeed, during the interview, appellant spoke more than the detectives, going on long

---

[5] During trial, the prosecutor misspoke and stated that the date of dispatch was May 21, 2019. The record, however, makes clear that the detectives were dispatched on May 21, 2018.

unrelated tangents about his relationships with his wife and girlfriend. The interview lasted about two and a half hours. Appellant never indicated that he wanted to leave; he never got up to leave; and he never asked to end the interview.

At the end of the interview, the detectives told appellant again that he was free to leave. The detectives then left and went out to the parking lot, and appellant returned to the lobby and later went outside with his wife. After conferring with their District Attorney and another detective who was in contact with the Hagerstown police, the detectives returned to the hotel and arrested appellant. The arrest took place about thirty to forty-five minutes after appellant's interview had concluded.

Appellant testified as well. Appellant stated that, when he first spoke to the detectives in the interview, he denied the allegations that he had been involved in any sexual activity with B.H. Later, appellant made incriminating statements to the detectives. When asked why he made those statements, appellant testified that every time that he said to the detectives that he told them everything he knew, "they kept on wanting more." When the detectives "kept on going and going," appellant "got scared," "wanted to get out of there," and "wanted to go home." Appellant claimed that if he didn't say anything, the detectives would charge him with forcible rape. Appellant then said, "So, the only thing I could think of was that if I give them what they wanted they would let me go and I could go home."

At the end of the State's case and again at the end of all of the evidence, appellant pointed to two statements, repeated several times by the detectives, that he claimed were improper promises under the common law of Maryland—(1) "The thing is we want to help

you out," and (2) "Regardless of what you tell us you're walking out that door without us." "You're not in trouble with us." The following are portions of the recorded interview relevant to appellant's contention.

At the beginning of the interview, Detective Masteller told appellant, "Let's clarify like you're not in trouble for anything" and "you don't have to talk to us." Similarly, Detective Hoffman said, "you are not obligated to talk to us at all. But we, you know, we'd like to understand what's going on."

Early in the interview, Detective Hoffman said:

> We [] understand that kids do lie. **Some kids do lie and sometimes they tell the truth**. A lot of times there's [] truth in the middle. **That's why we like to get with the other party and figure out what the heck is going on**.

(emphasis added). Detective Hoffman then encouraged appellant to tell his story by explaining that B.H.'s allegations might be painting appellant as the "bad guy":

> So, it's making me wonder, **maybe [B.H.] put you in a bad spot** and now she's turning this around and making you look like the bad person here? I mean this, **this is kind of where we need to fill in the blanks**. We need to have some sort of an understanding.

(emphasis added). Detective Masteller also suggested that B.H. was "throwing [appellant] under the bus [] when [the sexual relationship] [was] her idea the entire time."

Detective Masteller asked appellant to "actually dive into what happened" and talk about what appellant and B.H. had actually done. Detective Hoffman followed up:

> [DETECTIVE HOFFMAN]: **Well, I mean we don't want you to make anything up but the [] thing is we want to help you out. We don't want this girl lying on you and painting you in a bad light if that's not true. We want to figure out what**

**happened**.  Because obviously something happened or else we wouldn't be here.  Something happened.  We just want to understand and be able to explain it.

[DETECTIVE MASTELLER]: **Regardless of what you tell us you're walking out that door without us**.

[DETECTIVE HOFFMAN]: Yeah.

[DETECTIVE MASTELLER]: We're not – **you're not in trouble with this.  We made that very clear at the beginning**.  She said it, I said it, I'm saying it a third time.  **We're not taking you to jail if you tell us that you bent her over and raped her**.  We're not going to take you to jail if you tell us that she seduced you or it was a mutual exchange between the two of you.  I'm not going to talk to Jennifer either. . . . **What we need to know is what the actual truth of the matter is and right now we have one side of the story.  I think part of what you're saying is true**.  I think the context is very off.  And we've [] been really getting to it here where we're not with her.  **And that's what she's trying to say is, what's the truth of the matter?  You're walking out of here a free man regardless.  You're not in trouble with us**.

[APPELLANT]: Okay.

[DETECTIVE MASTELLER]: So it's not a this or that kind of situation like you think it is.  It's not.  **It's trying to find the truth of the matter so we know what we're actually dealing with**.

[APPELLANT]: [B.H.] makes up things. . . .

(emphasis added).

Detective Hoffman stated again, "we're trying to help you out here," and told appellant: "[W]e need to explain it.  You know, this whole like she's [] just acting out.  She's making this up.  Like no one is going to believe that."  Appellant then began to describe massages that he would give B.H.  The detectives pressed on:

[DETECTIVE HOFFMAN]: Okay.  Well, that would [] explain what she's saying.  You know?  **Our whole purpose of being here is trying to explain it**.

[APPELLANT]: I understand.  What you want me to say is like, yeah, yeah, she just, you know, she said yeah you can do it.  Oh, that feels good.  You know, like that feels good.

[DETECTIVE MASTELLER]: Whether it feels good or not—

[APPELLANT]: And there it is.

[DETECTIVE MASTELLER]: —therapy or not.  I don't know.

[APPELLANT]: But I can't help you.  And maybe I'm not helping myself.  Maybe, maybe I am worried about it now.

[DETECTIVE HOFFMAN]: **Well, you're not helping yourself**.

[APPELLANT]: No.

[DETECTIVE HOFFMAN]: **You're not helping yourself by just letting her do all the talking.  That's not helping you.  I mean this – what would help you is just don't tell us what we want to hear.  Tell us the truth.  That will help you.  Just the truth**.

[APPELLANT]: Okay.

(emphasis added).

Later, Detective Masteller told appellant, "I don't want you to say anything other than the truth."  When appellant admitted to putting his fingers in B.H.'s vagina, Detective Hoffman told him not to "make it up."  The detectives continued to push appellant to share his side of the events, because all they had was "her story."  When appellant responded that "her story is the only one that matters," the detectives said that wasn't true and encouraged him to offer his side.  Appellant admitted to fondling B.H., digitally penetrating her, and performing oral sex on her, but denied that B.H. ever performed oral sex on him.  When the detectives asked how many times appellant performed oral sex on B.H., appellant asked, "Can I say none?"  Detective Masteller responded, "Just tell me the truth."

At the conclusion of the suppression hearing, the trial court rendered a thorough and

well-reasoned oral opinion. Regarding appellant's claim that his incriminating statements were involuntary under the common law of Maryland, the Due Process Clause of the Fourteenth Amendment, and Article 22 of the Declaration of Rights, the court observed at the outset: "If I find that [appellant's statements] w[ere] the product of inducement or threat or his senses of free will were overcome[,] my understanding is it's not admissible for any purposes, even rebuttal . . . ." The court then commented briefly on the general nature of appellant's interview:

> I will comment he did seem eager to talk to the detectives. He testified that it was his 15 minutes of fame. You could tell from his demeanor on the recording as well as his testimony here today. And as well as the fact, well it was almost a two and [a] half hour long audio recording [and] most of the talking probably was done by [appellant]. He kept going into tangents about his relationship with his wife and his girlfriend and his other children and his son in Tennessee. . . . [A]pplying itch cream to his other daughter and whether that might be something that would get him in trouble. And all the while the detectives kept steering him back to this particular case.

Regarding the detectives' statement that they "want[ed] to help [appellant] out," the trial court found that this statement was not an improper promise. The court explained:

> **He [] was not promised a benefit. There were statements to him in the nature of, you know, we want to help you out**. . . . "Well, I don't mean we don't want you to make anything up, but the thing is we want to help you out. We don't want this girl lying on you and painting you in a bad light if that's not true." If in fact his statement exculpates him, and he's being accused of a crime and his statement clears him it actually would help him out.
>
> Obviously, his statement didn't help him out. **But it's nothing [] like an enticement that if [] you tell us something incriminating we will go to bat for you with a prosecutor. We will reduce the charges. We will see that you get bond.**

**We will go to the authorities and tell them you were cooperative. It's [] much more generic and [] not specific about whatever help the detectives offer him.**

> **It's to help him [] out if [] this young lady's lying then it will help you out to tell us the truth here. That's not a promise of a benefit.** That's a conversational use of words that is designed to obviously to induce a statement, but it's not designed really to make a serious offer to help him in any way. So, I don't find that as to be an offer of help. And the two or three other places something like that is said that we want to help you here it's not in any way designed to elicit something from him because there is a promise if you do this for us we will do that for you.

> **I think looking at the plain meaning of the words it's much more akin to, you know, we just want to find out the truth. Which incidentally, the police say several times** which incidentally [appellant] [] later on in the interview indicates, look, you know, what do you want to hear? I'll tell you. And both detectives pipe up, we don't want you to say what you think we want to hear. We just want the truth.

(emphasis added).

Regarding the detectives' statements that appellant would be free to leave at the end of the interview and he was "not in trouble with us," the trial court found that the detectives were credible in making these statements, and appellant did walk out after the interview, albeit for only one-half hour. The court said:

> **The police throughout the interview told him he would be free to leave at the end of the interview** and Detective Masteller testified today that he [] meant that, and they did leave, and the detectives left to the parking lot and [appellant] went back into the hotel and hung out apparently in the lobby. Albeit he didn't have a vehicle, but he could have walked away. Found some woods and disappeared into them.
>
> ***
>
> . . . In fact, like I said, he did walk out of there immediately and it was only a half hour later when all the ducks

got lined up that he got arrested. **And I think Detective Masteller and for that matter Detective Hoffman were credible in their statements to [appellant] contemporaneously with when they made them that he was not in any trouble and was not—with them—and was not going to be arrested by them**.

(emphasis added).

The trial court also pointed to appellant's testimony at the suppression hearing that he knew that he would go to jail if he admitted to the accusations against him. The court found:

> **[Appellant] testified at one point that he knows if he admits to what the police are accusing him of he'll go to jail**. He testified today, well he felt he was between a rock and a hard place. He admits it's consensual. You know, it might be five years in jail. He says, you know, if it's a forcible situation it might be life or longer in jail.
>
> ***
>
> . . . [Appellant] clearly seemed to indicate that he knew he had done something wrong. That's evident by the fact he denied it for the first, I don't know, 80 pages of this 119 page interview and by the fact that **he admitted that he knew he'd go to jail if he told the police officers what they were asking him. And it's evident by the fact that he broke down and said things like**, now he's cooked and screwed and **it's all over when he did give the incriminating statement**.

(emphasis added).

Finally, the trial court responded to appellant's argument that his incriminating statements were involuntary under the Due Process Clause and Article 22 by concluding that under the totality of the circumstances, appellant's statements were not involuntary. The court found that the following circumstances were relevant to its conclusion:

> **[Appellant] was never prevented from walking out**.

It was in the breakfast nook of a restaurant that he and his family had spent the night. People were coming and going, wait staff. You can actually hear that in the tape from time to time, people walking back and forth, while the two detectives were sitting across from him. [Appellant] testified [that] he felt that one was to the left and one was to the right and it would have been difficult for him to get out. **Again, they told him repeatedly, you don't have to talk to us**.

**And frankly, I don't find [appellant] credible about almost anything he said and specifically I'll say to that he was free to leave and objectively and subjectively I think he felt he was free to leave and he did not have to talk to these police officers. He testified today that he [] doesn't feel that way. But again, [] it seems from the demeanor of his testimony and his manner of testifying that that's contrived at this point**.

He doesn't seem to be drunk or high. He testified today that he was tired. There is no indication in the recording or in the testimony of Detective Masteller that [appellant] was tired. [The prosecutor] pointed out there's no yawning or anything like that going on. Again, he seemed excited and cooperative with the police officers. Not, fine, I'm beat. You know, what do you want to know? I need to go to bed.

\*\*\*

He did not repeat what the officers accused him of exactly. Ultimately, he admitted to fondling the victim and to performing oral sex on her. The police repeatedly asked him if he [] had her perform oral sex on him, I'm guessing that might have been in the statement the victim made because the police kept bringing that up and he repeatedly denied that. No, that never happened. So, it's not that he just said, fine, what do you want to [] hear? I'll tell you. Because he admitted to things that in the recording sound like he credibly did commit them, and he did not admit to performing or having her perform fellatio on him and throughout the interview he denied that.

\*\*\*

Again, he never indicated he wanted to leave. He never got up to leave. He never indicated he wanted to end the conversation. I do find [appellant] both from the recording and from his testimony today seems like an intelligent individual.

He's not someone who's easily bamboozled or mislead. He was in management positions before. He was a pastor for 20 years.

*\*\**

. . . The detectives could let [appellant] see the door, so he knew he was comfortable. I'm kind of jumping around here. But again, I didn't have the luxury to take this under advisement and write a good opinion. He was told he didn't have to talk and he was told, you can stop. He was told they didn't anticipate making any arrests. There was zero intention of making arrest. Detective Masteller testified credibly to that and Detective Masteller testified credibly [appellant] was more than willing to speak with us.

(emphasis added).

Ultimately, the court concluded:

**I don't find any inducement, coercion, promises, [or] threats to induce a statement** and under [] the totality of the circumstances that we've all heard, **and** I've described in limited detail here in my ruling **that there was any aspect of involuntariness about the statement and [the defense] motion to suppress his statement is respectfully declined**.

(emphasis added).

## B. Standard of Review

The circuit court's determination from a suppression hearing that a statement is voluntary is a mixed question of law and fact that we review *de novo*. *Buck v. State*, 181 Md. App. 585, 631 (2008). "In undertaking our review of the suppression court's ruling, we confine ourselves to what occurred at the suppression hearing." *Lee v. State*, 418 Md. 136, 148 (2011) (citing *Longshore v. State*, 399 Md. 486, 498 (2007)). "'[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' here, the State." *Id.* at 148 (quoting *Owens v. State*,

399 Md. 388, 403 (2007)). "We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *State v. Luckett*, 413 Md. 360, 375 n.3 (2010). "We, however, make our 'own independent constitutional appraisal,' by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.* (quoting *Longshore*, 399 Md. at 499).

### C. Contentions of the Parties

A confession may be used at trial if and only if it is:

> "(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)]."

*Winder v. State*, 362 Md. 275, 305–06 (2001) (alterations in original) (quoting *Hoey v. State*, 311 Md. 473, 480 (1988)). Appellant argues that the trial court erred when it denied his motion to suppress his incriminating statements to the Tennessee detectives because those statements were induced by improper promises and therefore involuntary under Maryland nonconstitutional common law. Appellant points to the same statements made by the detectives that appellant had argued to the trial court were improper promises: (1) "We want to help you out," and (2) "Regardless of what you tell us you're walking out that door without us" and he would not be in "trouble with" them. According to appellant, these statements were improper promises, because "any reasonable person in [a]ppellant's position would infer that the detectives had promised not to arrest him and that [a]ppellant would not be prosecuted for any statements he made."

Appellant, however, does not challenge the trial court's factual findings. Further, he does not argue that the statements were involuntary because of a violation of the Due Process Clause of the Fourteenth Amendment or Article 22 of the Maryland Declaration of Rights, or that there was any violation of *Miranda*. Appellant argues only that the statements were involuntary under the common law of Maryland.

The State responds that the detectives "did not make any improper inducement during [appellant's] interrogation." According to the State, the statement, "we want to help you out," was not an improper inducement, because the purpose of the statement "was to encourage [appellant] to avail himself of a chance to tell the truth." The State contends that, as a result, the statement is merely an exhortation to tell the truth, which is not violative of Maryland's common law. The State next argues that, when the detectives told appellant that "they did not intend to arrest him regardless of what he said during the interview," and that "he would not be in trouble with them," the detectives "had predetermined that they would not arrest [appellant] regardless of what he said. Thus, whether [appellant] made an admission or not, he would not receive a special benefit in exchange for special treatment by the officers." Alternatively, the State argues that, even if the detectives' comments were improper, appellant "did not rely on those remarks in making his admissions."

### D. Voluntariness under the Common Law of Maryland

Recently, in *Madrid v. State*, ___ Md. ____, ____ (2021), the Court of Appeals set forth a summary of the law regarding the voluntariness of confessions under the common law of Maryland. The Court wrote:

> Under the common law of Maryland, a confession is

involuntary where "it is the product of an improper threat, promise, or inducement by the police." *Lee v. State*, 418 Md. 136, 158, 12 A.3d 1238, 1252 (2011) (citation omitted). The common law of Maryland prohibits the admission of a confession where:

> (1) any officer or agent of the police promises or implies to the suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement.

*Id.* at 161, 12 A.3d at 1253 (citing *Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415, 420 (1979)). "Both prongs of the *Hillard* test must be satisfied before a confession is deemed to be involuntary." *Lee*, 418 Md. at 161, 12 A.3d at 1253 (quoting *Winder v. State*, 362 Md. 275, 310, 765 A.2d 97, 116 (2001)) (brackets omitted). The first prong of the *Hillard* "test is an objective one[,]" in that "a suspect's subjective belief that he or she will be advantaged in some way by confessing will not render the confession involuntary unless the belief was premised upon a statement or action made by an interrogating officer." *Winder*, 362 Md. at 311, 765 A.2d at 116 (citations omitted). The second prong of the *Hillard* test requires a court "to determine whether there was a nexus between the promise or inducement and the accused's confession" by assessing "the particular facts and circumstances surrounding the confession[,]" including "the amount of time elapsed between the inducement and the confession." *Id.* at 311–12, 765 A.2d at 117.

*Madrid*, No. 50, Sept. Term 2020, slip op. at 34–35 (Md. July 9, 2021).

Previously, in *Williams v. State*, 445 Md. 452 (2015), the Court of Appeals elaborated on the two-prong test initially articulated in *Hillard*:[6]

> "The first prong of the *Hillard* test is an objective one. In other words, when determining whether a police officer's

---

[6] The exclusionary rule of involuntary confessions articulated in *Hillard* stretches back to the 1873 case, *Nicholson v. State*, 38 Md. 140, 152 (1873). *Maryland Law of Confessions* § 2:3, at 20–21 (2020-2021 ed.).

conduct satisfies the first prong, the court must determine whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration; an accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under this prong. Ultimately, the court must determine whether the interrogating officers or an agent of the police made a threat, promise, or inducement. The threat, promise, or inducement can be considered improper regardless [of] whether it is express or implied.

If the suppression court finds that the law enforcement officer improperly induced the accused, then the second prong of the *Hillard* test requires the court to determine whether the accused relied on that inducement in making the statement he or she seeks to suppress. Specifically, the court must examine whether there exists a causal nexus between the inducement and the statement[.]"

445 Md. 452, 478–79 (2015) (quoting *Hill v. State*, 418 Md. 62, 76–77 (2011)). The State

has the burden of proving by a preponderance of the evidence that the confession was

voluntarily made. *Winder*, 362 Md. at 306.

### E. Analysis

Turning to the first prong in *Hillard*, we look to whether the detectives made an

improper threat, promise, or inducement. As previously indicated, appellant claims that

the detectives made improper promises by telling appellant that they wanted to "help" him

out and that regardless of what appellant told the detectives, he would not be arrested by

them. We summarize the detectives' statements:

***"Help"***
- "Well, I mean we don't want you to make anything up but the [] thing is we want to help you out. We don't want this girl lying on you and painting you in a bad light if that's not true. We want to figure out what happened."
- "[W]e're trying to help you out here."
- "Well, you're not helping yourself."
- "You're not helping yourself by just letting her do all the talking. That's not

helping you. I mean this—what would help you is just don't tell us what we want to hear. Tell us the truth. That will help you. Just the truth."

### *"Not Arrest" and "Not in Trouble"*
- "Let's clarify like you're not in trouble for anything."
- "Regardless of what you tell us you're walking out that door without us."
- "We're not—you're not in trouble with this. We made that very clear at the beginning. She said it, I said it, I'm saying it a third time. We're not taking you to jail if you tell us that you bent her over and raped her. We're not going to take you to jail if you tell us that she seduced you or it was a mutual exchange between the two of you. . . . What we need to know is what the actual truth of the matter is and right now we have one side of the story. . . . You're walking out of here a free man regardless. You're not in trouble with us."

We conclude that the above statements by the detectives do not constitute express or implied promises to appellant that he would be given "special consideration from a prosecuting authority or some other form of assistance in exchange for [his] confession." *See Madrid*, slip op. at 34; *Hillard*, 286 Md. at 153. When the detectives told appellant that they wanted to help him out, they never indicated that he would receive some form of "special consideration" or "assistance." As the trial court aptly found, appellant "was not promised a benefit," and the detectives' statements were "nothing like an enticement that if you tell us something incriminating we will go to bat for you with a prosecutor. We will reduce the charges. We will see that you get bond. We will go to the authorities and tell them you were cooperative." By contrast, in *Winder*, a police officer told the defendant, "I can make you a promise, okay? I can help you. I could help you, *I could try to protect you*." 362 Md. at 289 (emphasis added). The officer offered to personally call the State's Attorney to offer the defendant "some help." *Id.* The Court of Appeals "determined that the first prong of the *Hillard* test was satisfied because, during the twelve-hour interview,

the officers repeatedly said that they would help the defendant and 'offered him an apparent means to garner leniency from the state prosecutors and the trial court and protection from an angry mob.'" *Madrid*, slip op. at 36 (quoting *Winder*, 362 Md. at 317).

Furthermore, when their statements are taken in context, the detectives were actually encouraging appellant to help himself out by telling the truth about what happened between him and B.H. The detectives told appellant that they didn't want him "to make anything up," to "tell us what we want to hear," or "to say anything other than the truth." The detectives said that they needed to know what was "the actual truth of the matter," and they were "trying to find the truth of the matter so we know what we're actually dealing with." Detective Hoffman actually told appellant that telling the truth would help him. She said: "You're not helping yourself by just letting [B.H.] do all the talking.  That's not helping you.  I mean this—what would help you is just don't tell us what we want to hear.  Tell us the truth.  That will help you.  Just the truth." It is well established that mere exhortations by the police for the accused to tell the truth do not render any subsequent incriminating statements involuntary under Maryland common law. *Winder*, 362 Md. at 311 (stating that a mere exhortation to tell the truth is not enough to make a statement involuntary); *Ball v. State*, 347 Md. 156, 175–76 (1997) (same).

Regarding the detectives' statements that they would not arrest appellant regardless of what he told them, the detectives never expressly promised appellant that he would not be prosecuted for any statements that he made to them. Appellant does not contend otherwise.  Appellant is in effect arguing that the detectives made an implied promise of no prosecution that was objectively reasonable.  In our view, however, a reasonable person

in the position of appellant would not have believed that, if he admitted to facts constituting sexual abuse of a minor and multiple incidents of rape or sexual offenses, he would not be prosecuted. During the interview, the detectives told appellant that the investigation into B.H.'s accusations had already begun, and even if B.H. recanted, "the investigation will still continue." Also, at the suppression hearing, appellant testified that the detectives told him that an investigation was going on and that he would go to jail if he admitted to B.H.'s accusations, even if the sexual activity was consensual.

In *Smith v. State*, 220 Md. App. 256 (2014), this Court addressed an alleged improper promise under the common law of Maryland where the detective's statements to the defendant, who was accused of anally raping a four-year-old child, implied that there would be "less trouble if [he] . . . admitted to consensual contact." 220 Md. App. at 276 (alterations in original). In upholding the voluntariness of the confession, we held that "any reasonable layperson would recognize as ludicrous the chance of charges being dropped or lesser charges being filed in exchange for a confession to a patently perverse proposition—a four-year-old consenting to sexual conduct." *Id.* at 279. Likewise, in the instant case, we hold that a reasonable layperson would recognize as ludicrous the proposition that a promise of no arrest after a police interview implied no prosecution for incriminating statements about multiple instances of sexual acts and conduct with a fifteen/sixteen-year-old minor in the same household where the accused is told that the investigation will continue after the interview and that the incriminating statements could result in his incarceration.

For the foregoing reasons, we conclude that the State has satisfied the first prong of

the *Hillard* test by proving that the detectives did not make any improper promises during their interview of appellant. As a result, we need not address the second prong of the *Hillard* test, namely, whether appellant's incriminating statements were made in reliance on such improper promises. Therefore, we hold that appellant's statements made during the interview with the detectives were voluntary under the common law of Maryland. Accordingly, the trial court did not err in denying appellant's motion to suppress.

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**